SANDRA VILLAMIL et al., Plaintiffs-Appellants, v. JOHN A. BENAGES, Defendant-Appellee.

First District (5th Division)   No. 1—92—3398

Opinion filed December 3, 1993.—Rehearing denied January 12, 1994.

82

Robert F. Lisco, of Chicago, for appellants.

Randall C. Monroe, of Pretzel & Stouffer, Chartered, of Chicago (Robert Marc Chemers and Anne Scheitlin Johnson, of counsel), for appellee.

JUSTICE MURRAY delivered the opinion of the court:

Plaintiffs, Sandra Villamil and Jorge Villamil, filed a six-count complaint against defendant-appellee John A. Benages, M.D., and defendant Elmhurst Memorial Hospital alleging that defendants committed medical malpractice during the course of the delivery of plaintiffs' premature infant which allegedly resulted in the infant's death. Subsequently, plaintiffs amended their complaint to include count VII, which was directed solely against Dr. Benages and sought damages on behalf of plaintiff Sandra Villamil for the negligent infliction of emotional distress.

Plaintiffs' original six-count complaint alleged causes of action based upon the Wrongful Death Act (Ill. Rev. Stat. 1985, ch. 70, pars. 1, 2) (count I); section 15 of the Rights of Married Women Act (the Family Expense Act) (Ill. Rev. Stat. 1985, ch. 40, par. 1015) (count II); the Survival Act (Ill. Rev. Stat. 1985, ch. 110$^{1}$/$_{2}$, par. 27—6) (count III); *res ipsa loquitur* (count IV); and negligent infliction of emotional distress (counts V and VI). Counts V and VI, the negligent infliction

of emotional distress counts, were previously dismissed by the trial court for failure to state a cause of action. The dismissal was affirmed by this court in *Villamil v. Elmhurst Memorial Hospital* (1988), 175 Ill. App. 3d 668, 529 N.E.2d 1181, on the grounds that plaintiffs' allegations did not meet the requirements set forth in *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 457 N.E.2d 1.

On November 14, 1991, the trial court entered an order granting Dr. Benages' motion for summary judgment as to all counts. A separate order also entered on November 14, 1991, granted Dr. Benages' motion to dismiss count VII of the plaintiffs' amended complaint. On September 17, 1992, an order was entered denying the plaintiffs' motion to reconsider the orders of November 14, 1991, and including language making the two previous orders final and appealable. (See 134 Ill. 2d R. 304(a).) Plaintiffs filed a timely notice of appeal on September 24, 1992, wherein plaintiffs indicated their intent to appeal the orders of November 14, 1991, and September 17, 1992.

Plaintiffs present two issues for review: (1) whether the trial court erred in granting summary judgment in favor of defendant, Dr. Benages, on the basis of section 2a of the Medical Practice Act (the Good Samaritan Act) (see Ill. Rev. Stat. 1985, ch. 111, par. 4404); and (2) whether plaintiffs stated a cause of action for negligent infliction of emotional distress.

I

A motion for summary judgment should only be granted where the pleadings, depositions, and admissions on file, together with the affidavits, if any, disclose that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005; *Sons v. Taylor* (1991), 219 Ill. App. 3d 923, 925, 579 N.E.2d 1281.) The court must construe the pleadings, depositions and affidavits most strictly against the movant and liberally in favor of the nonmovant. (*Stringer v. Zacheis* (1982), 105 Ill. App. 3d 521, 522, 434 N.E.2d 50, 52.) The purpose of summary judgment is not to try an issue of fact, but rather to determine whether a triable issue of fact exists. *Sloan v. Jasper County Community Unit School District No. 1* (1988), 167 Ill. App. 3d 867, 870, 522 N.E.2d 334, 336.

The use of summary judgment is encouraged under Illinois law as an aid to the expeditious disposition of a lawsuit. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867.) However, it is a drastic means of disposing of litigation and should be allowed only when the right of the moving party is clear and free from doubt. (*Sons*, 219 Ill. App. 3d at 925.) Although the plaintiff does not have to try his case,

he must provide a factual basis which would arguably entitle him to judgment. (*Handy v. Sears, Roebuck & Co.* (1989), 182 Ill. App. 3d 969, 972, 538 N.E.2d 846.) In this case, the trial court decided that no issue of material fact existed which precluded the application of the Good Samaritan Act.

■ The Good Samaritan Act provides:

> "Any person licensed pursuant to this Act or any person licensed to practice the treatment of human ailments in any other state or territory of the United States, except a person licensed to practice midwifery, who, in good faith and without prior notice of the illness or injury provides emergency care without a fee to a person, shall not, as a result of their acts or omissions, except willful or wanton misconduct on the part of such person, in providing such care, be liable for civil damages." (Ill. Rev. Stat. 1985, ch. 111, par. 4404; 225 ILCS 60/30 (1992 West).)

Application of the Good Samaritan Act is based upon a three-part test: first, the doctor must not have notice of the illness or injury; second, the doctor must provide emergency care; and third, the doctor must not charge a fee. (*Roberts v. Myers* (1991), 210 Ill. App. 3d 408, 414, 569 N.E.2d 135; *Johnson v. Matviuw* (1988), 176 Ill. App. 3d 907, 531 N.E.2d 970.) In *Johnson* this court held that the Good Samaritan Act is applicable to emergencies occurring in a hospital if the other conditions stated in the statute are met.

Plaintiffs argue that the grant of summary judgment in favor of Dr. Benages was improper because genuine issues of material fact exist with respect to each of the elements of the Good Samaritan Act. Conversely, the defendant maintains summary judgment was proper.

The record contains the depositions of Dr. Benages, Sandra Villamil, and Jorge Villamil. Attached to the plaintiffs' reply to the motion for summary judgment was the following handwritten letter (public aid letter), sent from Dr. Benages' office to Mrs. Villamil. The letter states:

> "Ms. Sandra Villamil,
>
> Please send a copy of your public aid card to Dr. John A. Benages office at 19 S. Center Street, Bensenville, Illinois 60106 since it was he who delivered your baby on 9/16/85, and we need this number so that we can bill Illinois Public Aid.
>
> Thank you,
> Mary Ann Hanbrauch RN
> @ Dr. Benages Office."

It appears that the fact that this letter was sent to Mrs. Villamil is not disputed.

Dr. Benages testified during his deposition as follows: Dr. Benages is a board-certified family practitioner on staff at Elmhurst Memorial

Hospital. On September 16, 1985, Dr. Benages was in the hospital attending another patient of his who was in labor. Dr. Molly Lin, an obstetrician, was on call that evening and the nursing staff had repeatedly called her, but Dr. Lin never responded to that call. Dr. Benages had never met Sandra before this date.

Dr. Benages first came in contact with Sandra in the early morning in the delivery room shortly before her delivery. The hospital records reflect 4:23 a.m. September 16, 1985. Dr. Benages had been contacted by the labor room nurse, whom he believed to be Miss Shaver. He did not have any idea how much time elapsed from the time Sandra first came into the emergency room of the hospital until he saw her in the delivery room. He did not take any history from Sandra when he first saw her; however, the nurses had taken some sort of history. When he came in the delivery room, he introduced himself and told Sandra he was going to deliver her baby and they talked about the fact that the child would be premature and that he requested a pediatrician. From what he understood, the child was approximately 23 weeks. Miss Shaver was in the delivery room at his end of the delivery table. Dr. Benages told Sandra the baby was going to be premature based on what the nurses had told him. Dr. Benages testified that he did not make any clinical examination of Sandra prior to the actual delivery.

When he first met Sandra in the delivery room, he was getting ready for the delivery, gowning, and putting gloves on. Sandra was on the delivery table, she was on her back with her legs in stirrups. Since he did not put the patient in stirrups, he assumed the nurse must have. Although the delivery table can be tilted, the table was parallel to the floor. When Dr. Benages was putting on his gown, his back was to the patient. Dr. Benages turned around and delivered the baby. He clamped the cord, cut the cord, and handed the baby to Miss Shaver. Only minutes elapsed from the time he came into the delivery room until the baby was actually delivered.

Dr. Benages believed that Sandra's husband was present during the delivery, standing next to her by her head. To the best of his knowledge Dr. Benages never saw the baby fall onto the floor or from the delivery table onto the floor. The baby was severely premature when she was born.

Dr. Benages stated that after the delivery, he went upstairs to see how the child was doing. He then spoke with Sandra and told her the child wasn't doing very well and that they were contacting Loyola to transfer the baby there. Sometime after Sandra was discharged, Dr. Benages spoke with her on the phone, and at that time, he prescribed some medication for breast engorgement. Dr. Benages did

not recall talking to either Mr. or Mrs. Villamil after the death of their daughter.

Referring to the public aid letter, Dr. Benages testified that it is standard procedure in his office, when an individual is on public aid, to send such a note personally to the patient requesting the public aid numbers in order for the appropriate billing to be made. Dr. Benages did not recall actually instructing his nurse to send the letter to Mrs. Villamil; however, his nurse would have been instructed to send this type of letter as part of standard office procedure. After his nurse sent the letter to Sandra, no bill was ever submitted for the delivery of the Villamil child. Dr. Benages did not know whether Sandra ever returned the public aid number that was requested in the public aid letter. He has not been paid for his care and treatment of Sandra Villamil. Dr. Benages never billed Elmhurst Hospital for his care and treatment of Sandra Villamil or her child.

The discovery deposition of Jorge Villamil (Jorge) disclosed the following. Jorge testified that he speaks a little bit of English, but he does not speak fluently. In 1985 he spoke less English then he did at the time of the deposition. Jorge was married to Sandra Villamil. Sometime before midnight on September 15, 1985, his wife awakened him and told him she was having labor pains. He didn't remember very well, but he thought they arrived at Elmhurst hospital after midnight. When they first arrived at the hospital, his wife spoke with a nurse. The nurse asked his wife questions about the beginning of her labor. Although Jorge was present for the conversation, he didn't understand too well. His wife remained in the emergency room for about 15 minutes and then was taken to a room in the labor and delivery area of the hospital. Three nurses put Sandra in place on a bed. Approximately five minutes later, Dr. Benages came in the room. When Dr. Benages first saw Jorge's wife in the labor and delivery room, he said "it wasn't time." Dr. Benages examined his wife's "systems," her womb and vagina. Jorge did not ask Dr. Benages any questions at any time during that evening. Dr. Benages spoke to his wife in English.

Jorge stated that less than an hour elapsed between the time his wife was taken to the labor and delivery room until the time his wife delivered the baby. Dr. Benages never left the room from the time that he first arrived to see Sandra until the time that his wife delivered. When Dr. Benages had first arrived to see his wife, three nurses were still in the room. The nurses remained in the room after Dr. Benages moved away from his wife. Jorge stated that as Dr. Benages moved across the room, "he was doing something, his hands,

cleaning, putting something on, or he was putting something." His wife was on the table leaning back but not lying flat. Her legs were open lying flat on the table and the heels of her feet were still on the table. His wife's feet were never put in stirrups and no one was between his wife's legs at the time the baby was delivered. After Dr. Benages went to the front part of the room, the baby came out quickly. His wife was screaming "the baby's coming." Jorge was standing on his wife's left side, holding her hand. One of the female doctors was standing on the same side of the table as he was, closer to his wife's feet. Jorge knew she was a doctor because she was dressed in white. Although the other nurses were dressed in white, Jorge knew it was a doctor, because a nurse had said that the doctor was going to come.

From where he was standing, Jorge was able to see the baby come out of his wife's womb. The baby came out quickly and fell into a small table located at the end of the table his wife was lying on. The small table was a part of the table his wife was lying on; it was like a drawer that pulled out from the larger table and was not on the same level as the table. Regarding what happened at the time the baby was delivered Jorge stated:

"It came out. It fell on that table and it resounded, and it went all the way down. When the female doctor came, she was coming halfway towards the front, trying to catch the baby because she was coming from the front, and she saw the baby was already coming out halfway, and I wanted to grab the baby too, but I couldn't because I couldn't even talk."

When the baby came out, the baby was facing toward him. The baby fell on the little table first, hard, and the female doctor tried to grab it. The baby's head hit first, then the baby went all the way down to the floor and it hit itself much harder. The front part of the baby's head first came in contact with the floor. At the time the baby fell from the table, the umbilical cord was hanging from the womb of his wife and the baby. The nurse picked up the baby from the floor and the doctor came over and he cut the cord. Jorge stated that he didn't want to remember what had happened that night.

Jorge stated that he never paid any money to Dr. Benages, and although he received a bill from Elmhurst hospital, he did not receive a separate bill from Dr. Benages.

Sandra Villamil testified at her deposition as follows. She saw Dr. Shafer for prenatal care and was planning on having the baby at Hinsdale. Sandra had no reason to believe the child was going to be premature prior to the baby's birth. At approximately 7 p.m. on September 15, 1985, Sandra felt uneasy. She called Dr. Shafer at

about 8:30 to 9 p.m., and he told her it was nothing, everything had gone well up to then and she didn't really have anything to worry about. He told her to take a few Tylenol and to lie down. She did not take the Tylenol, but she did lie down.

At about midnight on the 16th, her husband drove her to Elmhurst hospital because Sandra couldn't stand the pain that she was having. Although she had wanted to go to Hinsdale Hospital, the pain was so bad she just went to Elmhurst. The first doctor to see her at Elmhurst was Dr. Benages. The first person she saw in the emergency room was a nurse who checked and told her she was going to have her baby that day and soon. The nurse checked the cervix and she was dilated. After about an hour and a half, the nurse took her to a labor and delivery room.

The first person to see her in the delivery room was a nurse. The nurse checked Sandra again and told Sandra she was going to have the baby. The nurse checked the cervix and she was halfway dilated. Sandra could not remember if a vaginal examination was performed in the emergency room, but she knows they performed one after that. The nurses got her ready to have the baby. When asked if she had seen a doctor up until this time, Sandra replied that she thought that Dr. Benages came in, and he said that she would be having the baby. After the nurses checked to see how far along she was, took her blood pressure and hooked her up to the monitor, Dr. Benages came in. Sandra did not remember how long it was after she got to the delivery room before Dr. Benages saw her. Sandra's understanding was that Dr. Benages was the doctor on call and he was going to deliver her baby.

When Dr. Benages saw Sandra for the first time he examined her, he checked the cervix to see how far along she was and told her she was going to have the baby. At that time, Sandra was in worse pain than she was when she got there. Sandra testified that she had the baby between two and four in the morning. She estimated that 10 to 15 minutes elapsed between when Dr. Benages entered the delivery room and the delivery itself. Jorge, a nurse and the doctor were all present when she delivered the baby. Nobody actually delivered the baby. She was not on the table very long, something under an hour, before the baby was delivered. The table was tilted and she did not think that her feet were in stirrups. At the time of delivery her legs were squatted up; she was in a "stand-sit" position. From what she remembers her feet were on the table. Sandra stated she said, "the baby is coming, the baby is coming," and the doctor replied, "no, we still have time." The doctor had his back toward her at this point in time and the nurse was on the same side of her as

her husband. The baby came out head first and went straight to the floor, hitting her head. The baby was still attached to the umbilical cord. From Sandra's position she was able to see the baby fall and she heard it on the floor. The delivery table was about three feet from the floor. The nurse picked the baby up from the floor and told Sandra she had a girl and that the baby was fine. The delivery table itself was all on one level. There was nothing else at the end of the table where her feet were. Sandra could remember seeing the baby on the floor, but she could not remember if she could see the baby's face or if she could see the baby's whole body.

Sandra does not remember if Dr. Benages examined the baby in the delivery room; however, Dr. Benages examined her after the baby was taken away. After Sandra delivered the baby she had a conversation with Dr. Benages. Sandra asked him about her baby and Dr. Benages said the baby was fine and gave her some pills for her breasts. Dr. Benages also gave her his number and told Sandra to contact him if she had any problems. The baby was transferred to Loyola. The baby's doctor at Loyola had thought something happened to the baby's head because the "blood count in the baby's head was a lot higher than it should have been."

Sandra identified her signature on a consent form for Elmhurst. The document indicated a time of 3 a.m. with Dr. Lin's name appearing on the top of the form. Sandra did not recall Dr. Lin's name appearing on the top of that consent form; however, she did hear something mentioned about her. Sandra did not recall ever signing a consent form with Dr. Benages' name on it.

Sandra testified she received a bill from Elmhurst which was paid by public aid. Sandra received a bill from Dr. Benages just after the baby was born. She did not remember what the amount of the bill was and she did not know if the bill was paid. She did not remember if she submitted Dr. Benages' bill to public aid. In addition to the bill itself from Dr. Benages, there was a cover letter which requested that she send a copy of her public aid card in order for them to bill public aid. The Villamils did not pay any bill to Dr. Benages. Sandra testified that she assumed Dr. Benages was paid by public aid. Sandra stated that she had never seen Dr. Benages before this incident.

During oral argument on the summary judgment motion, the trial court asked whether Sandra had ever tendered a document other than the request for a public aid number. Plaintiffs replied no. The trial judge stated that the facts as they were presented to him were that a request was sent out for a public aid number and nothing ever happened after that. He believed everyone admitted that the

public aid letter had been sent. When ruling on the motion, the trial court stated that in this situation Dr. Benages had no obligation to any other patient other than the one he was there attending. The trial court noted that the purpose underlying the Good Samaritan Act is to encourage someone in the position of defendant to assist in emergency situations and to find someone in the position of defendant liable would abrogate the policy behind the Act. The trial court found that there was no material issue of fact precluding the entry of summary judgment based on the Good Samaritan Act.

The first case to hold that the Good Samaritan Act applied to a doctor rendering emergency care in a hospital was *Johnson v. Matviuw* (1988), 176 Ill. App. 3d 907, 531 N.E.2d 970. While pregnant, Ms. Johnson was admitted to the hospital under the care of her own physician for the evaluation of chest pains. Five days after admission, Ms. Johnson went into respiratory and cardiac arrest. A "Code Blue" was sounded and nurses called down the hallway for help. Dr. Matviuw responded. Dr. Matviuw had staff privileges at the hospital and was attending to one of his own patients at the time. Dr. Matviuw went to Ms. Johnson's room and rendered medical treatment. A short time later Ms. Johnson's own doctor arrived and indicated he would take over. Ms. Johnson and her baby died later that evening. Subsequently, the hospital submitted bills for supplies and drugs used during the emergency; however, Dr. Matviuw did not receive a fee for his services. The trial court granted summary judgment in favor of Dr. Matviuw on the basis that he was immune from liability pursuant to the Good Samaritan Act. The appellate court affirmed that decision.

In *Roberts v. Myers* (1991), 210 Ill. App. 3d 408, 569 N.E.2d 135, the appellate court affirmed the trial court's grant of summary judgment in favor of Dr. Myers on the basis of the Good Samaritan Act. Ms. Ray went into labor and was admitted to the hospital at 5:30 a.m. She was under the care of her own doctors; however, sometime in the late afternoon her doctors left the hospital. Dr. Myers had staff privileges at the hospital and was attending one of his own obstetrical patients. At 5:12 a.m. Dr. Myers was informed that there was a deceleration in the fetal heart tones for Ms. Ray's baby. Dr. Myers did not have contact with Ms. Ray until 5:30 a.m. when he conducted a routine physical exam. Dr. Myers then retired to the doctors' lounge next to the delivery room. Approximately 10 minutes later a nurse was unable to detect any fetal heart tones and summoned Dr. Myers into the delivery room. An emergency delivery followed.

In applying the first part of the test, the court found that Dr. My-

ers had no prior notice of Ms. Ray's condition which ultimately affected the baby. Plaintiff argued that Dr. Myers had notice of the illness or injury because he had several contacts with Ms. Ray before she had the baby. Plaintiff argued that Dr. Myers was covering for Ms. Ray's doctors and should therefore have been held to have had complete knowledge of her condition. The court found the argument unpersuasive, even though Dr. Myers' progress notes were entitled "covering attending delivery note," because Dr. Myers had explained in his testimony that he used the word "covering" simply because he was the one who delivered the baby. The court also rejected plaintiff's attempt to establish Dr. Myers' notice when they argued that he had notice of the illness or injury at 5:12 a.m. when he was informed of the deceleration in the fetal heart tones. This court also found that Dr. Myers' examination at 5:30 a.m. failed to reveal any abnormalities and therefore he was not under any notice of an illness or injury. Meeting the second part of the test, the court found no question of fact concerning whether or not Dr. Myers provided emergency care and whether or not he had prior notice. Finally, the court found that Dr. Myers did not charge a fee for his services. (*Roberts v. Myers* (1991), 210 Ill. App. 3d 408, 569 N.E.2d 135.) Defendant argues it is clear that he did not have any prior notice of an illness or injury in that he was summoned to the delivery room only because Mrs. Villamil was about to give birth and the doctor on call could not be located. Dr. Benages had never met or spoken with plaintiffs and he maintains that he did not do an exam of any kind.

The first part of the test is whether Dr. Benages had notice of the illness or injury. There is no dispute that Dr. Benages had never seen Sandra prior to the date of her delivery. Even accepting as true Sandra's testimony that Dr. Benages examined her just prior to the delivery, there is no testimony to contradict the fact that this was the first knowledge that a premature birth was imminent. In addition, no testimony was presented to indicate that Dr. Benages had any knowledge other than a premature birth was about to occur.

The second part of the test is whether Dr. Benages provided emergency care. Plaintiff argues that in the present case if the infant was delivered after two to four hours of labor by a physician on call who had performed an internal examination of her some time before the delivery and where no life-threatening complications existed, as Mrs. Villamil testified, the trier of fact would be entitled to conclude that no emergency ever existed. Plaintiff contends that even Dr. Benages' testimony was essentially that this was an ordinary labor and delivery. Plaintiffs maintain that these facts, construed strictly against defendant, and in favor of the plaintiffs, support a conclusion

that no emergency ever existed. Plaintiffs argue there is evidence that Dr. Benages had ample notice of the condition of both Mrs. Villamil and the baby and that no life-threatening emergency existed.

First, Dr. Benages testified that he was not on call the evening the Villamil child was born, but rather that he was at the hospital attending another patient when the nurses called him in to attend to Sandra. Dr. Benages further testified that the nurses attempted to contact Dr. Lin, the doctor that was supposed to be on call. Sandra has presented no evidence to dispute this. Sandra testified that she was having such severe labor pains she had to go to the nearest hospital, she could not make it to the hospital that her own doctor was at. Sandra went into premature labor at Elmhurst hospital. As Sandra and Jorge testified, "the baby came out quickly." We find no question of fact precluding the fact that Dr. Benages provided emergency care to Sandra.

The third part of the test is whether Dr. Benages received a fee for his services. Defendant does not dispute that pursuant to his standard office procedure a request for plaintiffs' public aid number was sent, but he maintains the letter does not in and of itself constitute a bill. We must agree with defendant's argument. Jorge testified that he never received a bill and Sandra testified that they never paid a bill. Although a request for a public aid number was sent, nothing was ever produced to indicate that a bill was sent either to plaintiffs or public aid. The statute provides that service must be made gratuitously. Since the defendant was not paid and the plaintiffs were unable to produce anything that indicated they had received a bill, we must find that the services were rendered gratuitously. The fact that the public aid letter was sent is a red herring, the statute mentions nothing of intent, and therefore, even if the public aid letter could be construed as an intent to bill in the future, the fact that no bill was ever sent or payment provided must be controlling on this issue.

Accordingly, for all the reasons set forth above we find that the trial court properly granted summary judgment in favor of the defendant based upon the Good Samaritan Act.

II

In their second assignment of error, plaintiffs argue the trial court erred in dismissing count VII of the complaint.

Defendant argues a final order dismissing count VII of the plaintiffs' amended complaint was never entered by the trial court and therefore this court does not have jurisdiction to hear this portion of the appeal. On November 14, 1991, the trial court entered an or-

der granting Dr. Benages' motion for summary judgment as to all counts. A separate order also was entered on November 14, 1991, granting Dr. Benages' motion to dismiss count VII of the plaintiffs' amended complaint. The defendant is correct that the November 14, 1991, order dismissing count VII was not final and appealable. However, on September 17, 1992, an order was entered denying the plaintiffs' motion to reconsider and including language making the two previous orders final and appealable. (See 134 Ill. 2d R. 304(a).) The order states as follows:

"This cause coming on to be heard *on the court's reconsideration of defendant Benage's motion for summary judgment and this court's order of 11/14/91 and defendant's motion to dismiss Count VII,* due notice having been given, the court being fully advised in the premises,

It is hereby ordered that plaintiff's motion to reconsider its order of 11/14/91 is denied and summary judgment in favor of Dr. Benages and against plaintiffs shall stand. This court finds there is no just cause to delay enforcement or appeal of this order." (Emphasis added.)

The order indicates the trial court reconsidered defendant's motion to dismiss count VII and found the order to be final and appealable. We find that the dismissal of count VII was made final and appealable by the trial court's September 17, 1992, order.

In contrast to count VII, counts V and VI did not allege that Sandra was the direct victim of Dr. Benages' negligence. In count VII, Sandra alleged that she was a direct victim of the alleged negligence of Dr. Benages and that as a result of his negligent conduct, she suffered severe emotional and mental distress as a result of observing severe and permanent injuries foreseeably inflicted upon her newborn child. Plaintiff maintains that under *Corgan v. Muehling* (1991), 143 Ill. 2d 296, 574 N.E.2d 602, these allegations sufficiently state a cause of action for negligent infliction of emotional distress. Conversely, defendant contends that the trial court's dismissal of count VII of plaintiffs' amended complaint should be affirmed in that (1) it is controlled by this court's prior decision in *Villamil,* or (2) in the alternative, even if the court finds that decision not to be controlling, the dismissal should nevertheless be affirmed in that Mrs. Villamil is not a direct victim of defendant's alleged negligence.

For the following reasons, we find this issue is controlled by this court's prior decision in this case.

When the evidence on a subsequent appeal is the same or substantially the same as that on the first or prior appeal, the adjudications of the prior appeal become the law of the case. (*Hammer*

*v. Slive* (1962), 35 Ill. App. 2d 447, 450, 183 N.E.2d 49, 50.) However, there are two exceptions to the doctrine of law of the case. The first exception is where the supreme court, following the first appeal, makes a contrary ruling on the precise issues of law on which the appellate court had based its prior decision. The second exception allows the appellate court to find that its prior decision was palpably erroneous, but only when the court remanded the case for a new trial of all the issues. The rationale being that the appellate court, on the second appeal, actually would be reaching a different decision based on a new and different trial. (*Yonan v. Oak Park Federal Savings & Loan Association* (1975), 27 Ill. App. 3d 967, 971, 326 N.E.2d 773, 776-77.) Neither exception applies to the facts of this case.

In *Corgan*, the plaintiff alleged that the defendant, her psychologist, repeatedly engaged in sexual intercourse with her "under the guise of therapy." (*Corgan*, 143 Ill. 2d at 300, 574 N.E.2d 602.) The supreme court held that the requirements of *Rickey* did not apply to direct victims of negligence. The *Corgan* court did not abandon the *Rickey* zone-of-danger test, but rather distinguished *Rickey* finding that the *Rickey* test did not apply to that case, as the plaintiff was a direct victim and not a bystander. *Corgan*, 143 Ill. 2d at 300.

■ Mrs. Villamil contends that her cause of action is based upon her status as a direct victim of Dr. Benages' negligence and not merely as a bystander. In our prior decision, we found that Sandra's claims for emotional distress failed to meet the standards set forth in *Rickey*. In addition, we stated:

"We also reject Sandra's argument that 'mismanaged childbirth' situations are unique and the *Rickey* rule should be inapplicable in that the mother is a *direct victim* in her own right given the 'unitary relationship' between mother and child in childbirth and, accordingly, should recover for 'negligently inflicted *mental suffering*.' " (Emphasis in original.) (*Villamil*, 175 Ill. App. 3d at 672.)

We note that leave to appeal our decision in the first *Villamil* appeal was denied by the Illinois Supreme Court. *Villamil v. Elmhurst Memorial Hospital* (1988), 175 Ill. App. 3d 668, 529 N.E.2d 1181, *appeal denied* (1989), 124 Ill. 2d 562, 535 N.E.2d 922.

The amendment in this case raises no new basic issues. We conclude that the law of the case with respect to the Villamils' cause against Dr. Benages for the negligent infliction of emotional distress was established in the prior appeal of this case. See *Villamil v. Elmhurst Memorial Hospital* (1988), 175 Ill. App. 3d 668, 529 N.E.2d 1181.

Accordingly, for all the reasons set forth above, the decision of the trial court is affirmed.

Judgment affirmed.

GORDON, P.J., and McNULTY, J., concur.