THIRD DIVISION

May 9, 2001

No. 1--00--1530

MARGARITA RIVERA, Mother and Next Friend of OSVALDO RIVERA, a Minor, 

Plaintiff-Appellant,

v.

ENRIQUE ARANA, M.D., 

Defendant-Appellee. 

)

)

)

)

)

)

)

)

)

)

Appeal from the 

Circuit Court of

Cook County.

Honorable

Kathy M. Flanagan, 

Judge Presiding.

JUSTICE BURKE delivered the opinion of the court:

Plaintiff Margarita Rivera, as mother and next friend of Osvaldo Rivera, a minor, appeals from an order of the circuit court granting defendant Dr. Enrique Arana's motion for summary judgment based on the court's determination that defendant was immune from medical malpractice liability pursuant to the Good Samaritan Act (745 ILCS 49/25 (West 1998)).  On appeal, plaintiff contends that the trial court erred in granting summary judgment because genuine issues of material fact existed.  She also contends that the immunity provided by the Good Samaritan Act should not apply to a cause of action against a physician under the Abused and Neglected Child Reporting Act (Child Reporting Act) (325 ILCS 5/4.02 (West 1998)).  For the reasons set forth below, we affirm.

STATEMENT OF FACTS

On September 20, 1994, Dr. Arana treated Osvaldo Rivera (Osvaldo), the minor child of plaintiff, for a foot infection when his aunt, Marie Baez, who was then Osvaldo's legal guardian, brought him to Arana's office.  On July 3, 1997, plaintiff filed a medical malpractice complaint against Arana, alleging that he failed to take an adequate history or perform an adequate examination of Osvaldo, he failed to record signs of child abuse, and he failed to report suspected child abuse.  Defendant answered and, as an affirmative defense, alleged that the Good Samaritan Act barred plaintiff's claims.  Thereafter, on December 30, 1999, defendant filed a motion for summary judgment based on lack of liability pursuant to the Good Samaritan Act.

Dr. Arana presented his deposition and the depositions of Marie Baez and Gloria Miranda in support of his motion for summary judgment.  Arana, in his deposition, stated that he is an anatomical and clinical pathologist as well as a general practitioner at the Pro-Health Medical Center in Chicago.  In September 1994, three other doctors were working in the clinic with him and two medical assistants, one of whom was Miranda.   Arana saw Osvaldo only one time on September 20, 1994.  Arana's records regarding Osvaldo included an information/consent for treatment form and his handwritten notes.  Arana's notes stated that Osvaldo was brought in by his aunt, Baez.  Arana was seeing one of Baez's children and Baez asked that he also examine Osvaldo for infected feet.  According to Arana, Osvaldo was an add-on patient because Baez requested of his medical assistant "to be seen by [Arana] as an add-on without an appointment."  Arana further stated that seeing Osvaldo "was sort of a[n] emergency, because [Baez] had -- she requested to be seeing [
sic
] the child as an emergency."  Baez told Arana that she was Osvaldo's legal guardian, that she had no money, and she did not have a public aid medical card for Osvaldo.  Arana told Baez that that was okay and that he would see Osvaldo.  In taking a history, Baez did not know about Osvaldo's family history, nor whether he had an immunization card.  Baez stated that Osvaldo was living with her because his mother did not want him.  She told Arana that she was in the process of getting legal guardian papers for Osvaldo and a public aid card.

Dr. Arana performed a routine examination upon Osvaldo, which he stated took 15 to 20 minutes.  Osvaldo was a normal child with normal health, except that he was thin and underweight for his age (three years).  It was Arana's belief that Osvaldo suffered from poor nutrition.  Upon examination of Osvaldo's feet, Arana noted that the plantar surfaces of his feet were slightly infected.  Both feet showed superficial ulcers on the anterior surfaces, close to the toes.  There was mild inflammation, indicated by slight redness, and infection, indicated by slight yellow discoloration.  There were no open wounds, no odor, and no pus.  Because both feet were similar, Arana asked Baez if Osvaldo had been walking around barefoot since many children get foot infections from walking around barefoot.  Baez did not know.  Baez also did not know what happened to cause the foot condition and could not provide any information on how long the condition had existed.  Arana gave Baez a prescription for an antibiotic and topical ointment.
(footnote: 1)
 Dr. Arana further stated that he did not notice anything that appeared to be a burn.  He had seen cigarette burns before and Osvaldo's feet did not have any cigarette burns on them, nor did he see any marks that appeared to be healed burns.  Arana did not have any discussion with Baez about abuse at home and, when he saw Osvaldo, there were no signs of child abuse as far as medical evidence and he never considered the possibility that Osvaldo was a victim of child abuse.  He learned later from his attorney that Osvaldo was a victim of child abuse.  Arana further stated that he had attended many seminars on child abuse and, when he examined Osvaldo, he was aware of the statute requiring reporting of suspected child abuse.

Because of Osvaldo's low weight, Dr. Arana believed that Osvaldo needed a cell blood count (CBC) and a Chem 20 test to rule out anemia.  He advised Baez that she should bring Osvaldo back the next week for these tests, with or without a public aid card.  According to his testimony, Arana wrote on Osvaldo's chart, "return one week, and then no charge because she didn't have any money or public aid card."  Arana did not charge Baez for the visit "[b]ecause she didn't have any money.  This woman was poor, and she requested to be seen as an emergency, as an add-on-case, stating to Gloria Miranda that she didn't have a Public Aid card."  Arana testified that he does a lot of charity cases.

Marie Baez, in her deposition, stated that she was Osvaldo's aunt; her brother was the boy's father.  Osvaldo lived with her most of his life, on and off.  His mother, Margarita Rivera, abandoned Osvaldo when he was a couple of weeks old by leaving him on a street corner with his father.  Baez further stated that her brother would often bring Osvaldo to stay at her home.  Baez took Osvaldo in because her brother would leave him with everyone and anyone, "dope heads, crack heads, anybody."  When her brother was jailed, Osvaldo began to live with Baez permanently.  Osvaldo's mother never had any contact with him during the time he was with Baez, even though Baez attempted to arrange contact between Rivera and Osvaldo.

Baez further stated that every time Osvaldo came to her home, he had lice.  She also stated that Osvaldo always had pink eye, was congested, and sick.  She further stated that Osvaldo had had problems in the past with foot fungus or infection.  However, she never took Osvaldo to a doctor until he began to live with her permanently.  She treated him herself because she had three of her own children and knew how to take care of them.  Baez also stated that she got temporary custody of Osvaldo when her brother went to jail so that she had a right to take him for medical treatment.  

Baez further stated that she first brought Osvaldo to Dr. Arana for pink eye, but she could not remember when.  When she took  Osvaldo, one of her own children had pink eye.  According to Baez, Arana looked at Osvaldo, told her he had pink eye, but stated that he could not give her a prescription because she had no public aid card.  Baez received medication for her own child, which she used for both children.  Baez was not charged for this visit.

Baez also stated that when her son had the measles in September 1994, she took him to Dr. Arana, and also brought Osvaldo who had a foot fungus, although she did not have an appointment for either child.  According to Baez, Osvaldo had blisters of pus on his feet, the skin was peeling, there was cracking between the toes, the feet were sweaty, and stunk.  Baez denied that there were any burns on his feet.  Baez further stated that Arana simply looked at Osvaldo's feet.  She denied that Arana examined Osvaldo and that Arana gave her a prescription.  According to Baez, Arana simply told her to keep Osvaldo's feet dry and let them breathe.  Baez subsequently used her daughter's eczema medication on Osvaldo's feet.  Baez also denied that Arana advised her to return with Osvaldo the following week for other treatment. 

Sometime after the September office visit, Baez was severely beaten by her husband and was hospitalized.  She was comatose for 9 days and received 37 stitches in her neck.  It was at this time that her husband allegedly abused Osvaldo, which abuse is the underlying basis of plaintiff's medical malpractice claim in this lawsuit.  Baez was adamant that her husband had never abused any of the children prior to this time.  According to her, he was a perfect father but a bad husband.  Baez stated that she learned of her husband's abuse of Osvaldo from newspapers and the news while she was in the hospital.  She heard that her husband had beaten up Osvaldo, burned him, or put Nair in his eyes.  She also learned that her children were taken away by the Department of Children and Family Services.  She vehemently denied ever discussing her husband's abuse of Osvaldo with anyone either before, during, or after her hospitalization, and, in fact, denied any knowledge of it at all.  Baez also reiterated that she never paid Dr. Arana for Osvaldo's treatment and that she never received a bill for his services.

Gloria Miranda, in her deposition, stated that she was Dr. Arana's medical assistant.  During the time she worked for Arana, the clinic took care of many public aid patients.  Miranda did not know Osvaldo prior to September 20, 1994, but did know Baez and her children.  When Baez brought Osvaldo to the clinic on September 20, she told Miranda that she had Osvaldo, who was her brother's son, because her brother was in jail and Osvaldo's mother did not want him.  According to Miranda, Baez told her that she was attempting to get a medical card for Osvaldo and that she had brought Osvaldo to the clinic because he had a foot fungus or infection.

Miranda further stated that the visit was not a scheduled appointment.  Baez just walked in, which, according to Miranda, was a typical occurrence at the clinic.  Miranda had Baez fill out an information sheet for Osvaldo, and then she took Osvaldo's vital signs and reported them on his chart.  Miranda also stated that she looked at Osvaldo's feet, probably when she was weighing him, and noticed that the bottom of his feet were red.  With respect to payment by Baez, Miranda stated that even if Baez had returned with a medical card, the clinic may have not billed her because the card might not be retroactive for the September 20 visit.  Miranda also stated that Dr. Arana took this visit as a charity case and that public aid was not billed for the visit.

On March 29, 2000, the trial court granted defendant's motion for summary judgment based on its determination that Dr. Arana was immune from liability under the Good Samaritan Act.  In so ruling, the court considered the three factors necessary for application of the Act.  The trial court first noted that plaintiff did not contest the issue of notice of injury.  According to the court, the pertinent "illness or injury" was the purported child abuse.  The trial court then concluded that it was clear from all of the deposition testimony that Arana received no fee for his services, nor did he ever bill for them.  According to the trial court, even if Arana intended to bill for them, his intention was irrelevant.  With respect to whether Arana saw Osvaldo on an emergency basis, the trial court noted that both Arana and Baez characterized the visit as an emergency.  Additionally, Arana testified that the infection could spread throughout the minor's system and cause serious harm if it were not treated.  The trial court then relied upon an Oklahoma case to define emergency in its broadest sense.  It concluded, based on the "testimony of Dr. Arana, the Act's purpose and meaning, relevant case law and the dictates of logic," that Arana provided emergency care to Osvaldo.  Because all three factors were satisfied, the trial court concluded that Arana was immune from liability.  This appeal followed.

ANALYSIS

I.  Genuine Issues of Material Fact

A motion for summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file establish that no genuine issue as to any material fact exists and, therefore, the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2--1005(c) (West 1998); 
Cramer v. Insurance Exchange Agency
, 174 Ill. 2d 513, 530, 675 N.E.2d 897 (1996).  We review the trial court's granting of such a motion 
de novo
.  
McNamee v. State
, 
173 Ill. 2d 433, 438, 672 N.E.2d 1159 (1996).

Section 25 of the Good Samaritan Act provides:

"Any person licensed under the Medical Practice Act of 1987 or any person licensed to practice the treatment of human ailments in any other state or territory of the United States who, in good faith, provides emergency care without fee to a person, shall not, as a result of his or her acts or omissions, except willful or wanton misconduct on the part of the person, in providing the care, be liable for civil damages."  745 ILCS 49/25 (West 1998).
(footnote: 2)
It is the intent of the legislature that the provisions of the Good Samaritan Act be liberally construed.  745 ILCS 49/2 (West 1998).  A three-part test is employed to determine whether the Good Samaritan Act applies.  "First, the doctor must not have notice of the illness or injury; second, the doctor must provide emergency care, and third, the doctor must not charge a fee."  
Villamil v. Benages
, 257 Ill. App. 3d 81, 84, 628 N.E.2d 568 (1993).

Plaintiff contends that the trial court erred in granting summary judgment to defendant because two issues of material fact existed.  Plaintiff does not contest the fact that Dr. Arana had no notice of the injury or illness for which he treated plaintiff minor prior to his treatment--in fact, plaintiff admits that Arana had no notice.

A. Payment for Services

Plaintiff contends that there is a dispute as to whether or not Dr. Arana would be paid for his services.  Plaintiff maintains that because Osvaldo was to return the following week with a public aid card, Arana intended to be paid.  Plaintiff also contends that the number of times Arana treated Osvaldo is in dispute and is material to the issue before this court because it goes to the question of whether a physician-patient relationship existed.  According to plaintiff, because there was an ongoing physician-patient relationship, Arana had a reasonable expectation of being paid.

In 
Villamil
, the defendant doctor's office forwarded a letter requesting the plaintiffs' public aid number following the doctor's delivery of the plaintiffs' premature infant.  In concluding that the third factor required for application of the Good Samaritan Act was met, the court stated:

"Although a request for a public aid number was sent, nothing was ever produced to indicate that a bill was sent either to plaintiffs or public aid.  The statute provides that service must be made gratuitously.  Since the defendant was not paid and the plaintiffs were unable to produce anything that indicated they had received a bill, we must find that the services were rendered gratuitously.  The fact that the public aid letter was sent is a red herring, the statute mentions nothing of intent, and therefore, even if the public aid letter could be construed as an intent to bill in the future, the fact that no bill was ever sent or payment provided must be controlling on this issue."  
Villamil
, 257 Ill. App. 3d at 92.

The facts of the case before us are similar to those in 
Villamil
.  Baez was told to return to the doctor the following week with Osvaldo's public aid card.  However, she did not.  There is no evidence that a bill was ever sent to Baez, plaintiff, or public aid.  Baez specifically testified that she was not billed.  As in 
Villamil
, whatever Dr. Arana's intentions were with respect to possible billing in the future for his services, they are irrelevant.  Arana stated that he was never paid and this fact is controlling.  

We also reject plaintiff's argument that the number of times Dr. Arana treated Osvaldo is material.  She cites to no authority to support her position.  Failure to cite to relevant authority waives the issue.  
Campbell v. Wagner
, 303 Ill. App. 3d 609, 613, 708 N.E.2d 539 (1999).  Like the issue of intent, Arana's expectations are irrelevant.  As with intent, the statute mentions nothing with respect to expectations.  The pertinent fact is that no fee was charged or received.

Based on the foregoing, we conclude that there was no question of material fact precluding the trial court's decision that Dr. Arana rendered his services to Osvaldo gratuitously and received no fee.  Arana sent no bill, no bill was received and, more importantly, Arana was paid nothing.

B. Definition of Emergency Care

Plaintiff next contends that the trial court erred in relying on an Oklahoma case to define "emergency."  According to her, because the trial court relied on the "proposition that the phrase [emergency care] must be given the broadest possible meaning and that an emergency occurs whenever a person appears or is perceived to be ill or in need of succor," the trial court expanded the scope of emergency to include a routine examination.  Plaintiff further argues that the trial court's reliance on the Oklahoma case is misplaced because the Oklahoma statute defined emergency, whereas the Illinois statute does not.  It is plaintiff's position that Osvaldo's foot fungus did not present an emergency situation.  Plaintiff urges us to adopt, as a matter of law, the definition of emergency in Black's Law Dictionary and to limit the conditions to those defined in medical literature, such as Merck's Manual.

Defendant contends that it was proper for the trial court to rely upon the Oklahoma case because Illinois courts, in construing the Good Samaritan Act, take a broad approach to interpretation, which was the approach taken in Oklahoma.  Defendant also maintains that routine examinations can be a part of emergency care.

No Illinois case, addressing the Good Samaritan Act, has defined emergency or emergency care.  In fact, our independent research has revealed only three Illinois cases that define emergency, although in unrelated contexts.  In 
Young v. Forgas
, 308 Ill. App. 3d 553, 561, 720 N.E.2d 360 (1999), the issue was what constituted an emergency call for purposes of the Tort Immunity Act.  The court defined "emergency" as an "urgent need for assistance or relief," quoting Merriam-Webster Collegiate Dictionary 377 (10th ed. 1998).  In 
Nagel v. Gerald Dennen & Co.
, 272 Ill. App. 3d 516, 520, 650 N.E.2d 547 (1995), in interpreting what was an emergency motion, the court defined emergency as:

" 'A sudden unexpected happening; an unforeseen occurrence or condition; perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity.  Emergency is an unforeseen combination of circumstances that calls for immediate action without time for full deliberation.'  Black's Law Dictionary 522-23 (6th ed. 1990)."  

The last Illinois case to define emergency was 
Opyt's Amoco, Inc. v. Village of South Holland
, 149 Ill. 2d 265, 277-278, 595 N.E.2d 1060 (1992).  The court, in interpreting the constitutionality of a village Sunday closing ordinance, quoted Black's Law Dictionary, giving the same definition quoted above.

Several other jurisdictions have addressed the definition of  emergency with specific reference to Good Samaritan laws.  The trial court here relied upon one of them, 
i.e.
, 
Jackson v. Mercy Health Center, Inc.
, 864 P.2d 839 (Okla. 1993).  In 
Jackson
, the court stated that "[k]eeping in mind that the Act's purpose is to invite medical providers to intervene, the term 'emergency' must be given the broadest sense possible."  
Jackson
, 864 P.2d at 845.  Accordingly, the court concluded that "[w]ithin the Act's intended meaning an emergency occurs whenever a stranger appears (or may be perceived) to be ill or in need of succor."  
Jackson
, 864 P.2d at 845.

In 
Breazeal v. Henry Mayo Newhall Memorial Hospital
, 234 Cal. App. 3d 1329, 286 Cal. Rptr. 207 (1991), the court provided the following explanation of emergency:

"An emergency within the meaning of the Good Samaritan statutes exists when there is an urgent medical circumstance of so pressing a character that some kind of action must be taken.  [Citations.]  It would seem obvious that in determining whether a patient's condition constitutes such an emergency the trier of fact must consider the gravity, the certainty, and the immediacy of the consequences to be expected if no action is taken.  However, beyond observing that these are the relevant considerations, the variety of situations that would qualify as emergencies under any reasonable set of criteria is too great to admit of anything approaching a bright line rule as to just how grave, how certain, and how immediate such consequences have to be."  
Breazeal
, 234 Cal.  App. 3d at 1338, 286 Cal. Rptr. at 213.

The 
Breazeal
 court concluded that the issue of whether an emergency exists is an issue of fact.  
Breazeal
, 234 Cal. App. 3d at 1337, 286 Cal. Rptr. at 213.  See also 
Jackson
, 864 P.2d at 846 (Summers, J., dissenting) (agreeing with 
Breazeal
 that a bright line rule is not feasible and whether an emergency exists may be a question of fact for the jury).  Lastly, in 
Kearns v. Superior Court
, 204 Cal. App. 3d 1325, 1328, 252 Cal. Rptr. 4, 6 (1988), the court stated that "[a]n emergency exists '... where the exigency is of so pressing a character that some kind of action must be taken.' [Citation.]"

In addition to the above definitions, we have consulted two medical dictionaries.  The Attorney's Dictionary of Medicine defines "emergency" as "[a]n urgent demand for medical or surgical action; a medical or surgical condition demanding immediate action."  2 J.E. Schmidt, Attorney's Dictionary of Medicine E-71 (1999).  Stedman's Medical Dictionary defines "emergency" as "[a]n unlooked for contingency or happening; a sudden demand for action."  Stedman's Medical Dictionary 456 (24th ed. 1982).

We reject plaintiff's contention to define "emergency," as a matter of law, with a bright line rule and limit emergency care to those conditions outlined in medical journals.  As the 
Breazeal
 court noted, there are a variety of situations which may qualify as emergency care under the particular facts of a case, yet may not fall within any specific definition of emergency and may not be identified in medical literature as an emergency.   Accordingly, a flexible broad definition, given the purposes of the Good Samaritan Act and the need for medical providers to intervene and take care of individuals under a variety of situations without the threat of liability, is more logical.  Rather than a bright line rule, we believe that whether an emergency situation exists is to be resolved based on the unforeseen, unexpected combination of circumstances presented which require the need for immediate action, assistance, or relief.  Based on this definition, we conclude that the situation that Dr. Arana was presented was an emergency situation.  Osvaldo had an inflammation and, more importantly, an infection in his feet that required immediate attention.  The ulcers could have turned into a more serious and severe infection absent treatment.  We therefore conclude that there was no question of fact precluding the trial court's determination that Arana rendered emergency care to Osvaldo.  

Based on the foregoing, we find that the trial court properly granted defendant's motion for summary judgment.

II.  Application of Child Reporting Act

Plaintiff next contends that the Good Samaritan exception should not apply to a cause of action against a physician for his failure to report suspected child abuse pursuant to the Child Reporting Act.  In essence, it appears that plaintiff is asking this court to recognize a private cause of action under the Child Reporting Act for a physician's failure to report suspected child abuse.

Section 4 of the Child Reporting Act requires a physician, among others, "having reasonable cause to believe a child known to them in their professional or official capacity may be an abused child or a neglected child [to] immediately report or cause a report to be made."  325 ILCS 5/4 (West 1998).  Section 4.02 provides:

"Any physician who willfully fails to report suspected child abuse or neglect as required by this Act shall be referred to the Illinois State Medical Disciplinary Board for action in accordance with paragraph 22 of Section 22 of the Medical Practice Act of 1987."  325 ILCS 5/4.02 (West 1998).

We conclude that plaintiff has waived this issue by failing to raise it in the trial court.  In other cases reviewing the issue on appeal of whether a private cause of action exists under a particular statute, the issue had first been raised in the trial court.  See, 
e.g.
, 
Du Page Forklift Service, Inc. v. Material Handling Services, Inc.
, 195 Ill. 2d 71, 76, 744 N.E.2d 845 (2001); 
Abbasi ex rel. Abbasi v. Paraskevoulaskos
, 187 Ill. 2d 386, 388, 718 N.E.2d 181 (1999); 
McNeil v. Carter
, 318 Ill. App. 3d 939, 941, 742 N.E.2d 1277 (2001); 
Rekosh v. Parks
, 316 Ill. App. 3d 58, 61, 735 N.E.2d 765 (2000); 
Gonzalzles v. American Express Credit Corp.
, 315 Ill. App. 3d 199, 210, 733 N.E.2d 345 (2000).  Because plaintiff failed to plead a cause of action under the Child Reporting Act in the trial court, and thus failed to have the trial court determine the propriety of such a cause of action, she has waived the issue.

CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HALL, P.J., and WOLFSON, J., concur.

FOOTNOTES
1:
Arana's findings also indicated that Osvaldo suffered from "[b]ilateral mild conjunctiva inflammation," an inflammation of the eyes which, according to Arana, could have occurred from crying.

2:
Previously, the statute also contained the language "and without prior notice of the illness or injury" following "good faith."  This language was deleted by P.A. 90--742, §40, eff. Aug. 13, 1998.