## A05A0422. WILLINGHAM v. HUDSON.
### (617 SE2d 192)

BERNES, Judge.

Appellant Charlotte Willingham filed this medical malpractice action alleging that appellee Dr. Mark Hudson rendered negligent medical treatment which resulted in an infection and subsequent leg amputation.[1] Appellee moved for summary judgment on the basis of the "Good Samaritan" and "Hospital" immunity exemptions from civil liability pursuant to OCGA §§ 51-1-29 and 51-1-29.1 respectively. The trial court granted appellee's motion from which Willingham has filed the instant appeal. We agree that "Good Samaritan" immunity applies based upon the facts and evidence presented in this case, and therefore, we affirm.

The evidence of record shows that on or about February 14, 2000, a tornado struck Camilla in Mitchell County. Local hospitals were inundated with severely injured tornado victims. Between 2:00 a.m. and 3:00 a.m. during the crisis, an emergency room nurse at Grady General Hospital contacted appellee, a local family practitioner, and requested his assistance in treating the influx of patients at the hospital. Although appellee was not the on-call physician nor the ER back-up physician on that date, he and other local doctors arrived at the hospital and began treating the injured victims as requested.[2]

EMS transported Willingham, an injured tornado victim, to Grady General Hospital for medical treatment. She was suffering from a 20 cm x 14 cm laceration to her right thigh, which was open to the bone and exposed the femoral artery; a laceration to her right foot; and lacerations to her earlobe. Several different physicians treated Willingham upon her arrival at the hospital.[3] Another ER physician began to debride and irrigate the wound on her right thigh. However, when Willingham began to feel uncomfortable, that ER physician stopped the procedure and asked appellee to transport her to the operating room where the procedure could be completed with anes-

---

[1] Appellee treated Willingham on February 14, 2000. Thereafter, Willingham continued to be in his care while she remained hospitalized for several days thereafter. However, the complaint only alleges negligence regarding Willingham's treatment on February 14, 2000.

[2] Appellee treated a patient whose right arm had been removed from the shoulder, and who also had a fracture of the mid portion of her femur, a closed-head injury, and a pneumothorax. He also treated several other patients who had lacerations, contusions, and injuries.

[3] The parties disagree as to who treated the laceration to Willingham's right foot. In her deposition, Willingham initially stated that appellee treated the laceration to her right foot, but when questioned about medical records stating that another physician treated her right foot, she stated that she did not know. Appellee averred that Willingham's right foot wound had been closed and sutured by another physician before appellee treated Willingham's right thigh laceration. Appellee further averred that he only treated Willingham's right thigh wound and ear wound. Nonetheless, appellee was the only physician named in this lawsuit.

thesia. Thereafter, appellee treated the wound to Willingham's right thigh and earlobe. Before he loosely sutured the right thigh wound, appellee explored and irrigated it using saline and bacitracin. Willingham remained hospitalized for further treatment and observation.

Several days later, a "foul smelling purulent drainage" was coming from Willingham's right foot wound and Willingham could not move her toes. A follow-up x-ray revealed a "soft-tissue injury with gas in the soft tissues of the mid foot laterally" and "a questionable radiopaque foreign body" near the foot laceration. Thereafter, Willingham was transferred to Archbold Memorial Hospital where she was diagnosed as having a "necrotizing infection of the right foot with compartment syndrome and necrosis of the foot and lower leg." As a result of the infection, Willingham's right leg was amputated.

1. Willingham enumerates that the trial court erred by granting appellee's motion for summary judgment based upon the "Good Samaritan" defense. We disagree.

On a motion for summary judgment, the burden is on the movant to show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). The movant's burden may be discharged by referencing affidavits, depositions and other documentary evidence in the record showing that there is an absence of evidence to support the nonmovant's case. All the evidence is to be construed most strongly against the movant with all favorable inferences given to benefit the party opposing the motion. After the movant discharges his burden, the nonmovant cannot rest on his pleadings, but rather must point to specific evidence giving rise to a triable issue. OCGA § 9-11-56 (e); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). We review the trial court's decision on a motion for summary judgment de novo. *Rubin v. Cello Corp.*, 235 Ga. App. 250 (510 SE2d 541) (1998).

Pursuant to OCGA § 51-1-29, commonly known as the "Good Samaritan Law,"

> Any person, including any person licensed to practice medicine and surgery pursuant to Article 2 of Chapter 34 of Title 43 and including any person licensed to render services ancillary thereto, who in good faith renders emergency care at the scene of an accident or emergency to the victim or victims thereof without making any charge therefor shall not be liable for any civil damages as a result of any act or omission by such person in rendering emergency care or as

a result of any act or failure to act to provide or arrange for further medical treatment or care for the injured person.[4]

In *Clayton v. Kelly*, 183 Ga. App. 45 (357 SE2d 865) (1987), this Court explained the underlying principles of Georgia's "Good Samaritan" statute.

The basic premise of [Good Samaritan immunity statutes] is to induce voluntary rescue by removing the fear of potential liability which acts as an impediment to such rescue. Thus, they are directed at persons who are not under some pre-existing duty to rescue. If the doctor had a particular employment duty to aid the patient at the hospital or had a pre-existing doctor-patient relationship to the patient he aided, then he had a duty to the patient to begin with; and in such a case . . . the aid he offers is not voluntary in the sense of a Good Samaritan. . . . Good Samaritan statutes are directed at persons, including physicians, who *by chance and on an irregular basis* come upon or are called upon to render emergency care. The fact that a physician is skilled in the subject matter in question or that the exigency lies within his expertise, does not create a duty where none existed before; in fact, such persons are particularly encouraged by the statute to volunteer their aid. Neither is he deprived of immunity by the fact alone that he works at the hospital, or is present at the hospital, or is called to the hospital when the emergency arises.

(Citations and punctuation omitted; emphasis in original.) Id. at 47.

The burden of proof rested upon appellee to establish his "Good Samaritan" immunity defense. After appellee discharged his burden

---

[4] Effective February 16, 2005, Title 51 of the Georgia Code was amended to add § 51-1-29.5, including subsection (c), which provides specific "Good Samaritan" immunity for physicians and health care providers who render emergency medical care in a hospital emergency department, obstetrical unit or surgical suite. See 2005 Ga. L. Act 1, § 10 (S.B. 3). Emergency medical care is defined in that Code section as

bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

Id., codified as OCGA § 51-1-29.5 (a) (5). However, the new OCGA § 51-1-29.5 applies only to claims arising on or after the effective date of the Act, February 16, 2005. Any prior causes of action, such as the instant case, continue to apply OCGA § 51-1-29 as recited above. See 2005 Ga. L. Act 1, § 15 (b).

by referencing affidavits, deposition testimony, and the medical records and invoices, Willingham was required to point to specific documentary evidence of record, beyond mere accusations, that gave rise to a triable issue refuting the applicability of the "Good Samaritan" immunity.[5] After reviewing the record, we conclude that the undisputed evidence established appellee's entitlement to statutory immunity.

(a) *Emergency care at the scene of an emergency.* Willingham contends that an issue of fact existed as to whether Willingham was treated at the scene of an emergency within the meaning of OCGA § 51-1-29. The uncontroverted evidence showed that a tornado resulted in an irregular influx of injured victims and created an abnormal situation for which appellee was called upon to render emergency aid. Indeed, Willingham admits in her brief that the dangerous weather and numerous casualties suggested the existence of an emergency situation on the night that appellee was called to the emergency room. As noted previously, this court has held that the scene of an emergency may extend to the hospital location, and we agree with the trial court that the unrebutted evidence in this case established that on February 14, 2000, the hospital, faced with an influx of victims from a natural disaster, was the scene of an emergency. See *Clayton,* supra at 47.[6]

Willingham also contends that a genuine issue of fact exists as to whether appellee rendered emergency care. Willingham, a victim of the tornado, was transported to the hospital via EMS with several lacerations, including a 20 cm x 14 cm deep laceration that was open

---

[5] Willingham presented the expert affidavit and supplemental affidavit of Robert N. Dunn, M.D. in support of her medical malpractice claim and in accordance with OCGA § 9-11-9.1. These expert affidavits addressed the applicable standard of care, but did not address the applicability of "Good Samaritan" immunity.

[6] We note that other jurisdictions with similar "Good Samaritan" statutes also extend immunity to physicians who render emergency care at a hospital if they have no preexisting duty to do so. See *Johnson v. Matviuw,* 176 Ill. App.3d 907, 917-918 (531 NE2d 970) (1988) (court applied immunity to physician who rendered aid at a hospital); *Gordin v. William Beaumont Hosp.,* 180 Mich. App. 488 (447 NW2d 793) (1989) (court granted immunity to off-duty physician who responded to emergency call at the hospital); *McIntyre v. Ramirez,* 109 SW3d 741, 744 (46 Tex. Sup. Ct. J. 854) (2003) (court found that scene of emergency was a labor and delivery room in a hospital to which a certain provision of the "Good Samaritan" statute applied); *Hernandez v. Lukefahr,* 879 SW2d 137 (Tex. Ct. App. 1994) (court granted immunity to physician who assisted in efforts to resuscitate an infant in the hospital emergency room); *Hirpa v. IHC Hosp., Inc.,* 948 P2d 785, 788 (330 Utah Adv. Rep. 3) (1997) (Utah court concluded that "doctors are protected by the Good Samaritan Act when they respond to an in-hospital emergency, if they have no preexisting duty to do so.") (punctuation omitted). See also *Knox v. Adventist Health System/Sunbelt,* 817 S2d 961, 963 (27 Fla. L. Weekly D1221) (Fla. Dist. Ct. App. 5th Dist. 2002) (finding that Florida's "Good Samaritan" statute only immunizes conduct occurring within the hospital). Compare *Velazquez v. Jiminez,* 172 N.J. 240 (798 A2d 51) (2002) (finding that New Jersey's Good Samaritan statute does not apply to a hospital physician who renders emergency care to a patient at a hospital).

to her bone and that exposed her femoral artery. In his uncontroverted affidavit, appellee averred that when he treated Willingham, she had an emergency medical condition. Compare *Herrin Business Products v. Ergle*, 254 Ga. App. 713, 715 (1) (563 SE2d 442) (2002) (where this court determined that no emergency existed when the victim's blood-sugar problems were normal and repetitive events, and the circumstances of the victim's treatment did not indicate any urgency).

While the term "emergency care" is not defined in OCGA § 51-1-29, our Supreme Court has defined the term in a similar statutory context as "the performance of necessary personal services during an unforeseen circumstance that calls for immediate action." *Anderson v. Little & Davenport Funeral Home*, 242 Ga. 751, 753 (1) (251 SE2d 250) (1978).[7] Other jurisdictions have applied a similar definition in providing construction and application of their "Good Samaritan" statutes.[8] This definition does not require that the victim be in a critical or life-threatening condition. Id.

When appellee was called upon to treat Willingham, she had an exposed and dirty wound which presented a high likelihood of infection. Another physician, who had already commenced treatment of Willingham, called upon appellee to complete Willingham's treatment in the operating room where anesthesia could be administered.[9] The physician summoned appellee when he realized that he could not

---

[7] In *Anderson*, supra, the Court defined the term in the context of a statute providing immunity to ambulance service personnel who render in good faith "emergency care to a person who is a victim of an accident or emergency" and receive no remuneration. See OCGA § 31-11-8.

[8] See *Hirpa*, supra at 788-789 (court cited to the definition provided in *Anderson*, supra, and further relied on a dictionary definition of emergency as "an unexpected situation or occurrence that demands immediate attention. American Heritage Dictionary 232 (2d Coll. ed. 1983)."). See also *Rivera v. Arana*, 322 Ill. App.3d 641, 651 (749 NE2d 434) (2001) (court concluded that an inflammation and infection on a child's feet constituted an emergency that required immediate attention, and noted that the ulcers could have resulted in a more serious and severe infection absent treatment; the court ruled that "whether an emergency situation exists is to be resolved based on the unforeseen, unexpected combination of circumstances presented which require the need for immediate action, assistance, or relief"); *Swenson v. Waseca Mut. Ins. Co.*, 653 NW2d 794, 799 (Minn. Ct. App. 2002) (court ruled that "an accident victim does not need to be suffering from a life-threatening injury in order for an emergency to exist" and defined "emergency" as "any event or occasional combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency; an unforeseen occurrence or condition"); *Jackson v. Mercy Health Center*, 864 P2d 839, 845 (Okla. 1993) ("Within the [Oklahoma] Act's intended meaning[,] an emergency occurs whenever a stranger appears (or may be perceived) to be ill or in need of succor.") (punctuation omitted); *Eoff v. Hal & Charlie Peterson Foundation*, 811 SW2d 187 (Tex. Ct. App. 1991) (court defined "emergency" as "a condition arising suddenly and unexpectedly . . . and which calls for immediate action . . ."). See also *McCain v. Batson*, 233 Mont. 288 (760 P2d 725) (1988) (court found that emergency care was rendered although the physician's treatment of the injured's pierced upper thigh was performed three hours after the incident, and when the injured did not experience much bleeding or pain).

[9] The other physician told appellee that Willingham's "wound needed to be further

complete Willingham's treatment without causing her undue discomfort. As such, the uncontroverted evidence established that appellee's treatment of Willingham was rendered during an unforeseen circumstance that called for immediate action. See *Rivera v. Arana*, 322 Ill. App.3d 641, 651 (749 NE2d 434) (2001); *Swenson v. Waseca Mut. Ins. Co.*, 653 NW2d 794, 799 (Minn. Ct. App. 2002); *McCain v. Batson*, 233 Mont. 288 (760 P2d 725) (1988).

Willingham nevertheless contends that appellee's admission that Willingham was not in "critical" condition created an issue of fact as to whether appellee rendered "emergency care." While the triage nurse classified Willingham as a "5" or "critical," appellee deposed that he believed she was a "2" or "3," a delayed or minimal patient for purposes of the emergency room because her bleeding was controlled and her vital signs were stable. However, as we have previously indicated, evidence that Willingham was not in a critical or life-threatening condition is not dispositive of whether she received emergency medical care.

*Gragg v. Neurological Assoc.*, 152 Ga. App. 586 (263 SE2d 496) (1979), cited by Willingham, is factually inapposite. In *Gragg*, the patient was undergoing a routine angiogram procedure, which could have been discontinued without placing the patient's health in danger. The complication did not arise until after the physician began the diagnostic procedure. Id. In the instant case, however, Willingham's severe condition constituted an emergency that developed before she arrived at the hospital and continued to exist throughout the time that she received urgent medical care by appellee at the hospital.

(b) *Duty to render aid.* Next, Willingham argues that appellee had a duty to report to the emergency room to render aid at the time of her treatment. She bases her argument on the fact that appellee had an employment contract with the D. Archbold Memorial Hospital, Inc. system, of which Grady General Hospital was a part. However, the rule announced in *Clayton* makes clear that a physician is not deprived of "Good Samaritan" immunity by the fact that he works at the hospital when the emergency arises. *Clayton*, supra at 47. See also fn. 6 citing *Gordin v. William Beaumont Hosp.*, 180 Mich. App. 488, 490-493 (447 NW2d 793) (1989) (finding that physician who was not on-call had no duty to respond to the request for assistance at hospital's emergency room).

In this case, it is undisputed that appellee did not have a pre-existing doctor-patient relationship with Willingham and had not treated her prior to that night. Moreover, the record evidence

---

explored and irrigated, and that she was too uncomfortable with his initial attempts to wash that wound out."

reflects that although appellee was a salaried employee of the hospital system that included Grady General Hospital, he was not required to report for duty on the night of the tornado incident. Appellee's employment agreement only required appellee to work specific hours of approximately 40 to 50 hours per week based on the need for a full-time family practitioner and to work on-call to back up ER physicians on a rotating schedule. In this case, however, it is clear that appellee was not scheduled to be the on-call physician nor back-up ER physician on the night of the incident. Compare *Henry v. Barfield*, 186 Ga. App. 423, 425 (1) (367 SE2d 289) (1988) (physical precedent only) (finding that summary judgment was precluded when the evidence was ambiguous as to whether the physician was on-call at the time that he rendered care to the victim).

Nor does Section 1 (b) (xiv) of appellee's Physician Employment Agreement, cited by Willingham, indicate otherwise. That provision merely required appellee to cooperate with the hospital's administrator and other management personnel in "scheduling work" so as to provide full coverage at the hospital. The unrebutted evidence reflected that a nurse, and not the hospital's administrator or management, called and requested appellee's assistance in handling the influx of injured tornado victims. There was no evidence presented to indicate that the nurse called on behalf of the administrator or management, or had been authorized to do so. Accordingly, the evidence failed to establish that appellee would have been in breach of his employment contract and would have suffered any adverse employment action had he chosen not to assist.

The evidence of record established that appellee's purpose for being at the hospital was to render volunteer aid to the injured tornado victims, including Willingham. The evidence failed to present an issue of fact as to this issue.

(c) *Compensation for services.* Willingham further contends that a question of fact existed as to whether appellee had an expectation of compensation when he provided her treatment. Based on the uncontradicted evidence, we disagree.

There is no evidence that appellee charged for his medical services rendered to Willingham on February 14, 2000. Willingham presented several medical bills and statements submitted by the hospital. However, the unrebutted testimony of appellee during the course of his deposition and by way of affidavit, established that appellee had not submitted any charges for the services he rendered to Willingham on February 14, 2000 and that no charges for his medical services are reflected on the billing records.

Appellee further testified that he was authorized to determine whether to charge for certain services and that he had elected not to

charge Willingham for services he rendered that day. Appellee explained, "[s]he had been injured so severely. She lost her house. She didn't need any more bills from me." It also is noteworthy that appellee did not bill other tornado victims he treated in the emergency room that day. Willingham did not proffer any specific evidence refuting appellee's testimony.

Willingham argues that a jury could find that appellee's contractual performance bonus was contingent in some degree upon his complying with the request for assistance. The terms of the contract do not indicate any such contingency and appellee affirmatively denied that any such contingency existed. "Guesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment." (Citation and punctuation omitted.) *Heath v. Rush*, 259 Ga. App. 887, 888 (578 SE2d 564) (2003).

We emphasize that appellee's failure to charge for his services does not control the applicability of the "Good Samaritan" defense in its entirety. "The expectation of payment is not to be regarded as superficially controlling in a case [involving the 'Good Samaritan' defense]. . . . If the facts show a duty to respond by virtue of a person's particular employment, his state of mind as to payment will not thwart that duty." *Clayton*, supra at 46. Here, evidence that appellee had no duty to render aid to Willingham, coupled with the evidence that he did not charge for his services rendered to her under emergency circumstances, authorized the trial court to determine that the "Good Samaritan" immunity applied in this case. Where there is no evidence that contradicts a physician's affidavit testimony that he did not receive compensation for his services, and where the other requirements establishing immunity have been met, summary judgment in favor of the physician is proper. See *Washington v. Clark*, 250 Ga. App. 242, 243-244 (550 SE2d 671) (2001) (physical precedent only).

In this case, "[h]aving established the nonexistence of any genuine issue of material fact and that [Willingham] was not entitled to recover from [appellee] under any theory raised, summary judgment was demanded for [appellee]." *Wallace v. Hall*, 145 Ga. App. 610, 612 (244 SE2d 129) (1978). Therefore, the trial court did not err by granting summary judgment in appellee's favor.

2. As a result of our ruling on the applicability of "Good Samaritan" immunity in Division 1, Willingham's enumeration of error as to the applicability of "Hospital" immunity need not be addressed.

*Judgment affirmed. Blackburn, P. J., and Miller, J., concur.*

DECIDED JULY 7, 2005.

*Hinton & Powell, Douglas R. Powell,* for appellant.
*Coleman, Talley, Newbern, Kurrie, Preston & Holland, Wade H. Coleman, Edward F. Preston, Hodges, Erwin, Hedrick & Coleman, William A. Erwin, J. Patrick Ward,* for appellee.