KELLY DEANN ROBERTS, a Minor, by Doris Ann Ray, her Mother and Next Friend, Plaintiff-Appellant, v. STEPHEN A. MYERS, Defendant-Appellee (Robert P. Olson *et al.*, Defendants).

First District (5th Division)   No. 1—89—2257

Opinion filed March 1, 1991.

Hayes & Power, of Chicago (Larry R. Rogers, of counsel), for appellant.

Rooks, Pitts & Poust, of Chicago (David J. Pritchard and Patricia C. Nowak, of counsel), for appellee.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Doris Ann Ray, on behalf of her daughter, Kelly Deann Roberts, filed suit against defendant Stephen A. Myers, M.D., and others alleging negligence in the prenatal care and delivery of Kelly. Dr. Myers moved for summary judgment on the ground that he was immune from liability pursuant to section 4400—30 of the Medical Practice Act of 1987 (Ill. Rev. Stat. 1989, ch. 111, par. 4400—30), commonly known as

the Good Samaritan statute. The trial judge granted Dr. Myers' motion and entered a finding pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)). This appeal followed. We consider whether the trial judge erred in applying the Good Samaritan statute to Dr. Myers.

We affirm.

We note at the outset that the record on appeal, which is over 1,400 pages, contains many irrelevant documents and does not contain many other relevant documents. The relevant documents not contained in the record include the defendant's motion for summary judgment and reply memoranda, the deposition of the only party with independent recollection of the events alleged, and various medical records. We will limit our consideration to the facts contained in the record.

From the time of birth Kelly Roberts has suffered from quadriplegia and cerebral palsy. The events prior to and during Kelly's delivery form the substance of the complaint, as amended.

On October 28, 1977, Doris Ray went into labor and was admitted to Rush-Presbyterian-St. Luke's Hospital (Rush) at 5:30 a.m. Prior to admission to Rush, Doris had been under the care of her personal obstetricians, Drs. Olson, Long and Voyevidka. During the morning and early afternoon of October 28, Drs. Olson and Voyevidka periodically examined Doris at Rush. Sometime in the late afternoon, Drs. Olson and Voyevidka left the hospital, but Doris continued to receive care from the hospital nurses and resident doctors.

Dr. Myers, who had staff privileges at Rush but was employed by Health Care Specialists, S.C., was at Rush that afternoon caring for his own obstetrical patients. Meanwhile, one of the nurses in the labor room applied an electronic fetal monitor to Doris and began observing the fetal heart tones. The nurse also recorded her observations on a labor progress record. The labor progress record, which outlined the relevant events leading up to Kelly's delivery, stated:

"4:35 p.m. —   SVE per Dr. Toig
              FHT's
5:30 p.m. —   SVE per Dr. Myers
5:12 p.m.     [circled] — external fetal monitor applied
              Decelerations noted—contractions
              Dr. Myers informed
5:35 p.m. —   To Delivery Room D Ready for Delivery
5:40 p.m. —   no FHT's heard by L. Weaver LN 2 —
              Dr. Myers. FHT's heard per D. Gadek
              RN 100
MIDFORCEPS GIRL at 5:55 p.m.''

Dr. Toig was a resident at Rush and at 4:35 p.m. he performed a sterile vaginal exam on Doris. The 5:12 p.m. entry was circled because that was the regular notation used to indicate events that were recorded out of order. At 5:12 p.m., one of the nurses "informed" Dr. Myers of decelerations in the fetal heart tones. The labor progress record did not reflect whether the decelerations were benign or abnormal nor did it reflect whether the nurse actually showed Dr. Myers the tracing strip or just verbally passed along her observations. The tracing strip itself was not available as evidence in these proceedings. At any rate, Dr. Myers did not perform any emergency care for Doris at 5:12 p.m. as a result of having been informed of the decelerations in the fetal heart tones. In fact, the labor progress record indicates that Dr. Myers did not have any personal contact with Doris until 5:30 p.m. when he performed a routine sterile vaginal exam. Dr. Myers then retired to the doctor's lounge which was located next to the delivery room. At 5:35 p.m., the labor progress record indicates that Doris was taken to the delivery room. At 5:40 p.m., Nurse Weaver could not hear fetal heart tones, but Nurse Gadek could hear some fetal heart tones. Dr. Toig deemed it necessary to obtain immediate assistance from another doctor. Nurse Gadek saw Dr. Myers in the doctor's lounge and brought him into the delivery room.

Dr. Myers recorded his own involvement with the delivery of Kelly on a progress note which he entitled "Covering Attending Delivery Note." He wrote this note at 6:15 p.m., after he delivered Kelly. In the note, Dr. Myers characterized the fetal heart tone decelerations which he had been informed of at 5:12 p.m. as "type one dips." When Dr. Myers was brought to the delivery room by Nurse Gadek at 5:40 p.m., his note explains: "After checking myself and confirming inability to hear fetal heart tones, immediate steps taken to prepare for delivery *** Simpsons forceps applied with the delivery of a depressed female infant approximately 3,000 grams." A mid-forceps delivery was one of the fastest techniques used for delivering a baby.

Dr. Myers gave his deposition for this case in 1988, over 10 years after he delivered Kelly. He testified that he had no independent recollection of the events on the day he delivered Kelly and could therefore only testify based on the available medical records. When asked to explain why he entitled his progress note "Covering Attending Delivery Note," Dr. Myers testified that he was not the patient's attending doctor, so it would have been inappropriate to write "Patient's Attending Delivery Note." Furthermore, he was not a resident doctor, so that is why he used the word "attending." He used the word

"covering" simply because he was the doctor that delivered the baby. Dr. Myers repeatedly denied that he was covering for Doris' personal obstetricians.

Dr. Myers also testified that his progress note was entirely consistent with the existence of an emergency. Furthermore, at one point in Dr. Myers' deposition, plaintiff's counsel and Dr. Myers had the following exchange:

"Q. It appears that this was an emergency situation when you were called in, is that right?

A. As far as I can determine."

Dr. Myers also explained that "type one dips" is one of three ways of describing periodic changes in the fetal heart rate and are not associated with fetal distress. Dr. Myers believed that a condition called "velamentous insertion of the cord" caused the loss of the fetal heart tones. He testified:

"I believe that, since there was really no indication that there was any significant abnormality up until the time heart tones were reported to have been lost, since velamentous insertion of the cord is a condition which is associated with sudden intrapartum fetal death, and since it was very clear that this placental abnormality at any rate was present in this case, there is a very, very strong probability that, in fact, that was the underlying mechanism for why the fetal heart tones were lost."

In his deposition, Dr. Myers was also shown a memorandum prepared by another doctor who had been employed by Rush in 1977. The memorandum contained a procedure for classifying high risk patients. Dr. Myers did not remember ever using the procedure while he was on staff at Rush. Dr. Myers testified that he classified his patients as high or low risk based on individual assessment. One factor on the memorandum which required a high-risk classification was whether the fetal position was "breech, transverse lie or unknown." Doris' medical record indicated that four examinations were performed by the attending doctors for prenatal care all showing a normal cephalic presentation. One junior house officer made a notation, however, that there was a question of a breech presentation. Dr. Myers testified that he was absolutely certain that this last notation did not require that Doris be classified as high risk. Dr. Myers attributed the notation to the junior house officer's inexperience. Upon delivery, the fetus had, in fact, a normal cephalic presentation.

Finally, Dr. Myers testified that he did not receive a fee for delivering Kelly. Furthermore, he had no knowledge that his employer, Health Care Specialists, received any fee.

Plaintiff's medical expert, Dr. Parer, was also deposed in 1988. His testimony was limited to his review of the medical records and portions of some of the defendants' depositions. Dr. Parer testified that there was no evidence that trauma was involved in the mid-forceps delivery. There was a question, although, whether the baby might have bled in-utero which would have been consistent with bleeding from a velamentous insertion of the cord. Dr. Parer testified that a velamentous insertion of the cord was not detectable prior to birth in 1977.

Dr. Parer gave testimony concerning a list of factors that most doctors in 1977 agreed were indicative of high risk patients. Dr. Parer was then asked whether any of those factors were present in this case. He answered no, except for the question of the breech fetal position. Dr. Parer admitted, however, that a breech position was not present in this case and that the junior house officer's notation was probably the result of his inexperience. Dr. Parer testified that as of the time Doris was taken to the delivery room there was no indication of fetal distress.

In Dr. Parer's opinion, the cerebral palsy was due to asphyxia during labor. He based this opinion on three criteria that were present during and after delivery: low apgar scores, acidosis, and seizures. Dr. Parer admitted that the low apgar scores, seen alone, would not provide a doctor with the ability to differentiate the degree of the asphyxia. Dr. Parer also admitted that he determined that acidosis was present based on a blood gas reading taken 35 minutes after Kelly was delivered. The seizures also occurred after Kelly was delivered.

Dr. Parer testified that he had two concerns with Dr. Myers' involvement in this case. First, it was his opinion that Dr. Myers' progress note characterizing the fetal heart tone decelerations as "type one dips" was inconsistent with the rest of the course of the baby including the later acid/base status and blood gas readings. He believed that the decelerations were most likely "late," a characterization which he described as potentially abnormal. Dr. Parer added, however, that even if the decelerations were "late," Dr. Myers would not have been able to determine from an isolated reading that the fetus was in distress. Dr. Parer also admitted that "type one dips" could be consistent with what he read in the medical records. Dr. Parer added that he did not know what Dr. Myers was informed of, and that Dr. Myers may have been told, in fact, that the decelerations were "type one dips." Also, if Dr. Myers was informed that they were "type one dips," Dr. Parer testified that this information would have provided

Dr. Myers with an assumption that the baby was not in immediate trouble.

Second, Dr. Parer testified that the subsequent loss of fetal heart tones at 5:40 p.m. was a sign that the fetus was in jeopardy. Therefore, it was Dr. Parer's opinion that Dr. Myers delayed too long between the time when no fetal heart tones were heard and when he delivered the baby at 5:55 p.m. Dr. Parer admitted, however, that he did not know whether Doris had already been given an anesthetic or whether the forceps had been put in place. Dr. Parer testified that these factors, which in fact occurred after the fetal heart tones were lost, would minimize his questions over the 15-minute delay.

During the oral arguments on the summary judgment motion, the trial judge expressed two concerns over the plaintiff's argument that the Good Samaritan statute did not apply. First, the trial judge thought that the facts of this case were indistinguishable from the only case on point which held that a doctor who provided emergency care in a hospital was immune from liability under the Good Samaritan statute. Second, the trial judge believed that, given the facts of the instant case, the plaintiff's arguments were based on an overly narrow reading of the Good Samaritan statute.

For the reasons that follow, we affirm the trial judge's entry of summary judgment in favor of Dr. Myers.

OPINION

■■ ■ It is well established that summary judgment is proper where the pleadings, depositions, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).) In this case, the trial judge decided that there was no genuine issue of material fact precluding the application of the Good Samaritan statute, which provides doctors with immunity from liability for negligent medical care. (Ill. Rev. Stat. 1989, ch. 111, par. 4400—30.) Application of the statute is based on a three-part test: first, the doctor must not have notice of the illness or injury; second, the doctor must provide emergency care; and third, the doctor must not charge a fee. *Johnson v. Matviuw* (1988), 176 Ill. App. 3d 907, 531 N.E.2d 970.

*Johnson* is the only Illinois case on the question whether the Good Samaritan statute applies to doctors providing emergency care in a hospital. The facts of *Johnson* are as follows. On April 4, 1983, Connie Johnson was admitted to Sherman Hospital under the care of her own physician for an evaluation of chest pains. At that time, Connie was 37 weeks pregnant with an expected delivery date of

April 8. At 7:30 p.m. on April 9, Connie experienced cardiac arrest. A "Code Blue" was sounded and some nurses called down the hallway for help. Dr. Mitviuw, who was attending to one of his own patients in the hospital pursuant to his staff privileges, responded to the nurses' calls. He went to Connie's room and inserted an endotracheal tube and began resuscitation. A respiratory team arrived and provided more assistance. About 17 minutes later, Connie's own doctor arrived and declared that he would take over. Connie could not be resuscitated, however. Connie and her child were pronounced dead at 8:20 p.m. that evening. Later, the hospital did bill Connie's estate for supplies and drugs used during the emergency, but Dr. Matviuw received no fee for his services. The administrator of Connie's estate sued Dr. Matviuw and others, alleging negligent medical care. The trial judge granted Dr. Matviuw's motion for summary judgment on the ground that he was immune pursuant to the Good Samaritan statute. The appellate court affirmed.

In the instant case, counsel for the plaintiff stated in his brief that he rests this appeal on an attempt to distinguish our facts from *Johnson*. Even if there are some distinguishing facts in the two cases, it does not necessarily follow that the trial judge, here, erred in applying the Good Samaritan statute. We have analyzed the record on appeal and have determined that there are no genuine issues of material fact concerning the three-part test for application of the Good Samaritan statute.

The first part of the test is whether Dr. Myers had notice of the illness or injury. In *Johnson*, the court's opinion contained limited discussion of notice because the pregnant patient went into cardiac arrest and the defendant doctor began caring for her immediately upon hearing the nurses' shouts. Here, plaintiff argues that Dr. Myers had notice of the illness or injury because he had several contacts with Doris before he delivered Kelly. Plaintiff raises several points in support thereof. First, plaintiff argues that Dr. Myers was covering for Doris' own obstetricians and should therefore be held to have had complete knowledge of Doris' condition. The only evidence that plaintiff cites in support of this argument is Dr. Myers' progress note which he entitled "Covering Attending Delivery Note." We find this argument unpersuasive in light of Dr. Myers' testimony. Dr. Myers repeatedly denied that he was covering for Doris' personal obstetricians. In his testimony concerning the title of his progress note, he fully explained that he used the word "covering" simply because he was the one that delivered the baby.

The plaintiff also argues that Dr. Myers had notice of the illness or injury at 5:12 p.m. based on the possibility that there was medical information showing abnormal fetal heart tone decelerations and an abnormal fetal lie. The record does show that Dr. Myers was informed by a nurse that the electronic monitor applied to Doris indicated decelerations. The record does not show if the nurse actually showed Dr. Myers the tracing strip or just verbally passed along her observations. Also, the tracing strip itself was unavailable as evidence in these proceedings. Therefore, whether the information given Dr. Myers indicated benign or abnormal fetal heart tones must be gleaned from the rest of the record.

The only statement in the medical records actually characterizing the decelerations was Dr. Myers' notation that they were "type one dips." The medical testimony has established that "type one dips" would have provided Dr. Myers with an assumption that the baby was not in trouble. On the other hand, the plaintiff's medical expert, Dr. Parer, testified that he thought that "type one dips" were inconsistent with the rest of the course of the baby. We find his testimony unpersuasive for a number of reasons. Dr. Parer admitted that "type one dips" could be consistent with what he read in the records. Dr. Parer also admitted that he did not know what Dr. Myers was informed of, and that Dr. Myers may have been told, in fact, that they were "type one dips." Dr. Parer also testified that, even if the decelerations were "late," Dr. Myers would not have been able to determine from an isolated reading that the fetus was in distress.

Plaintiff also argues that there is a question whether the fetus was in a breech position and this should have put Dr. Myers on notice that Doris was a high risk patient. In support of this argument, plaintiff first cites to the notation by the junior house officer indicating there was a question of a breech presentation. Next, plaintiff cites to the memorandum which required that a fetus in a breech, transverse or unknown lie be classified as a high risk patient. However, we find that Dr. Myers' testimony is conclusive on the question of fetal position. Dr. Myers considered the junior house officer's notation the result of his inexperience, and Dr. Parer conceded this as well. Dr. Myers relied on the results of four examinations by the prenatal attending doctors which indicated a normal cephalic presentation. The baby was, in fact, delivered in a normal cephalic presentation.

A number of other facts in the record corroborate the conclusion that Dr. Myers had no notice that the baby was in trouble. At 5:30 p.m. Dr. Myers performed a routine sterile vaginal exam. Dr. Myers then retired to the doctors' lounge. In his deposition, Dr. Myers testi-

fied that "there was really no indication that there was any significant abnormality up until the time heart tones were reported to have been lost."

In Dr. Parer's deposition, he testified that as of the time Doris was taken to the delivery room there was no indication of fetal distress. Although Dr. Parer testified that it was his opinion that the cerebral palsy was due to asphyxia during labor, he based that opinion on information that could not have put Dr. Myers on notice prior to delivery. Dr. Parer also testified that a velamentous insertion of the cord was not detectable prior to birth in 1977.

Therefore, we hold that there was no question of fact precluding the trial judge's decision that Dr. Myers did not have notice of the illness or injury.

■■ The second part of the test is whether Dr. Myers provided emergency care. In *Johnson*, a "Code Blue" was sounded which clearly established the existence of an emergency. Although there was no "Code Blue" sounded here, there seems to be no question that an emergency existed when the nurse failed to hear fetal heart tones. When the nurse reported the loss of fetal heart tones, the resident doctor deemed it necessary to obtain immediate assistance from another doctor. Dr. Myers' progress note states that after confirming the loss of fetal heart tones, he took "immediate steps" to prepare for delivery. He then performed a mid-forceps delivery, which was one of the fastest techniques used for delivering babies. We also note that Dr. Parer's testimony concerning the delay before delivery constitutes evidence of negligence which is not relevant here given the immunity that the Good Samaritan statute provides.

Dr. Myers also testified that the title to his progress note was entirely consistent with the existence of an emergency. He added that the loss of the fetal heart tones was a "significant abnormality." Dr. Parer testified that the loss of fetal heart tones was a sign that the fetus was in jeopardy. Finally, we observe that at one point in Dr. Myers' deposition, plaintiff's counsel admitted that there was an "emergency situation."

Therefore, we hold that there was no question of fact precluding the trial judge's decision that Dr. Myers provided emergency care.

■■ The third part of the test is whether Dr. Myers received a fee for his services. In *Johnson*, the defendant doctor did not charge a fee for his services, but the hospital did charge a fee for the supplies and drugs used during the emergency. The court held that these facts satisfied the no fee requirement under the statute. Here, Dr. Myers testified that he did not receive a fee for delivering Kelly and that he

had no knowledge that his employer, Health Care Specialists, received any fee. Plaintiff has presented no evidence to the contrary.

Therefore, we hold that there was no question of fact precluding the trial judge's decision that Dr. Myers received no fee for his services.

In summary, we hold that there are no genuine issues of material fact precluding application of the Good Samaritan statute. Therefore, we affirm the trial judge's entry of summary judgment in favor of Dr. Myers.

Affirmed.

MURRAY and McNULTY, JJ., concur.