FIFTH DIVISION

 June 14, 2002 

No. 1-00-2588

KAMERON BLANCHARD, a Minor, by His Mother, 

Patricia Blanchard, 

Plaintiff-Appellant, 

v.

MEREDITH MURRAY,       

Defendant-Appellee  

(West Suburban Hospital, Through its   Nurses and Doctors, and MARK PENN, 

Defendants). 

))))) ))))))))))))

Appeal from the

Circuit Court of

Cook County

Honorable

Diane J. Larsen, 

Judge Presiding.

JUSTICE QUINN delivered the opinion of the court:

Plaintiff, Patricia Blanchard (Blanchard), on behalf of her son, Kameron Blanchard, filed suit against defendants, Dr. Meredith Murray, Dr. Mark Penn, and West Suburban Hospital, alleging negligence in the delivery of Kameron.
(footnote: 1)  Blanchard appeals from an order of the trial court granting Dr. Murray's motion for summary judgment based on the court's determination that Dr. Murray was immune from liability pursuant to the Good Samaritan Act (745 ILCS 49/25 (West 1998)).  Blanchard contends that the trial court erred in granting summary judgment in favor of Dr. Murray because several genuine issues of material fact exist as to whether the Good Samaritan Act applies.  For the following reasons, we reverse and remand.

On April 29, 1991, Blanchard was admitted to West Suburban Hospital (West Suburban) with labor pains.  During her pregnancy, Blanchard was treated through the Chicago Board of Health at St. Anne's Professional Building (St. Anne's).  However, St. Anne's closed some time before Blanchard gave birth.  At West Suburban, Dr. Murray was contacted to perform a cesarean section delivery on Blanchard.  During the course of the cesarean delivery, Blanchard's baby, Kameron, suffered an injury to his right ring finger.

Blanchard filed suit and in Count I of her complaint alleged that Dr. Murray:

"a. Negligently performed a cesarean section 

to deliver the minor, Kameron Blanchard, wherein the said

minor was injured; 

b. Negligently extended the uterine incision 

during the cesarean section too deep; 

c. Otherwise fell below the standard of care

of physicians of his type."

Plaintiff alleged that as a direct and proximate result, Dr. Murray cut the right ring finger of Kameron and that he suffered injury to his body and limbs both internally and externally.

In her deposition, Blanchard testified that she arrived at West Suburban on April 30, 1991, between 11 p.m. and midnight.  Dr. Penn examined Blanchard and discovered that she was in labor with contractions occurring every one to two minutes.  Blanchard was attached to a baby monitor and informed of how much her cervix was dilated.  Blanchard testified that some time later, she was told that the baby's heart rate was dropping.  Dr. Penn informed  Blanchard that an emergency cesarean section would have to be performed because the baby was in distress.  Blanchard testified that Dr. Murray, who to her knowledge was an on-call physician, entered the room and said that he would be performing the cesarean section.

Blanchard testified that after the birth of the baby, her first recollection was of being awakened by a nurse who told her that something happened and that Kameron had to be transferred to another hospital.  Some time later, Dr. Murray told Blanchard that the baby was cut when he threw his right hand up during the course of the cesarean section.

In his deposition, Dr. Murray read from Blanchard's medical file and noted that the baby's heart rate continued to drop between 2:35 a.m. and 3:15 a.m.   At 3:10 a.m., Dr. Penn called Dr. Murray at his home.  At 4 a.m., Dr. Murray arrived at West Suburban.  The cesarean started at 4:26 a.m. and was completed by 5 a.m.  According to Dr. Murray, the progress notes stated that the neonatologist present during the cesarean section attended the procedure because of fetal distress.  Dr. Murray testified that these progress notes meant that the neonatologist attended the procedure because there was fetal distress rather than "in case" there was fetal distress.  Dr. Murray opined that if the baby had not been delivered by cesarean section, the delivery may have been more problematic because the umbilical cord was wrapped around the baby's neck.

When asked whether Blanchard's cesarean section was an emergency, Dr. Murray testified that it was urgent.  Dr. Murray explained the difference between "emergent" and "urgent" care as follows:

"Q.  In your opinion was this cesarean section 

an emergency?

A. It was - 

Q. Why and how?

A. - urgent.

Q. You're using the word urgent differently

than emergency?

A. I think so, yeah?

Q. Tell me the difference? 

A. There are different degrees of emergency.

One is - the real emergency is imminent death, that all 

of a sudden the heart tones go to 60 or 40 or 0, ad [
sic
]

you got four minutes, you got to cut.  You can't wait for 

anything.  You just - like a postmortem C-section.

Q. And the next degree?

A. The next one is its going to have to be 

done, and you can't wait till the regular morning 

schedule to do it.

Q. And is that called urgent or is that 

called- 

A. That would be urgent or emergent.

Different people could call it different things. In

order to get people to come in and help you, you have 

got to tell them it's an emergency, otherwise they're

going to say wait till morning, call me in the morning,

 I'm not coming.  So we have to declare that this was an

emergency, and that was done - 

Q. In order -

A. - before I got there.  They called the 

emergency, they called me at home.

Q. And-

A. I came, and I agreed that it should be 

done, and we went ahead and did it.

Q. This was not the first description of an 

emergency that you gave me where you have four minutes

to act?

A. No it wasn't."

Dr. Murray testified that Blanchard was not a regular patient, that he had not seen her before April 30, 1991, and that he did not conduct any follow-up care.  Dr. Murray further testified that he did not charge Blanchard for medical services because he was there as a service to West Suburban in support of its residency program.

Dr. Murray also testified that he was not a regular on-call physician for the hospital and that he was unsure why he was called that night:

"I could have been covering for my partner or

they could have called me for some other reason because

there was - they did have a call schedule for the OB

attending physician that were backing up.

It's a requirement.  The hospital has to have 

a call schedule for the OB service so that they can

always find somebody in an emergency.  And for whatever

reason, they called me that night, and I came in." 

Dr. Penn testified that on April 30, 1991, he was doing his obstetrics rotation as a resident at West Suburban.  Dr. Penn testified that Blanchard had no prenatal care with West Suburban so she was classified as a "walk-in."  As a resident, Dr. Penn's involvement in the delivery was placing the heart monitor on the baby.

Dr. Penn testified that Dr. Murray was on call that day and that he had not worked with Dr. Murray before or since that day.  He knew that Dr. Murray was on call for the night because his name was on a list at the nurse's station.  Dr. Penn telephoned Dr. Murray at approximately 3:10 a.m. because the baby was experiencing heart decelerations, which meant that the baby was possibly in distress.

Dr. Murray filed a motion for summary judgment and argued that the Good Samaritan Act was applicable, exempted his actions in treating Blanchard and that he should be dismissed as a defendant.  In response, Blanchard argued that the Good Samaritan Act was inapplicable because there was no emergency and there was ample notice that an injury existed.  Blanchard further argued that the Good Samaritan Act is inapplicable even though Dr. Murray charged no fee for his services because he was part of a program benefitting the residency program at the hospital.

The trial court granted Dr. Murray's motion for summary judgment. In doing so, the trial court found that there was no ample notice, Dr. Murray was not a regular on-call doctor and that 

the situation was an emergency.  The court further found no support for plaintiff's argument that the Good Samaritan Act is inapplicable where a doctor charges no fee because he is part of a program which benefits a residency program at a hospital.

Blanchard filed a motion to reconsider and in support of her motion, she submitted the affidavit of Dr. Richard Rock, who averred that in his opinion, the case involved a medical situation that was not an emergency but, rather, a cesarean section for failure to progress.  Dr. Rock stated that his opinion was based on the "long time lapse between the time Dr. Murray was called and the cesarean section."  Dr. Rock indicated that the surgery did not begin until 76 minutes after Murray was called.  The trial court ruled that Blanchard repeated each and every argument made in her response to the motion for summary judgment.  The court found that Blanchard failed to explain why this evidence was not available or could not have been produced at the time of the original motion and ruled that Blanchard's motion for reconsideration was without merit.  Blanchard's timely appeal followed.

Blanchard contends that the trial court erred in granting summary judgment in favor of Dr. Murray.  Blanchard asserts that several genuine issues of material fact exist as to whether the Good Samaritan Act (Act) (745 ILCS 49/25 (West 1998)) immunized Dr. Murray's actions.

A motion for summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file demonstrate that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 1998); 
Rumford v. Countrywide Funding Corp.
, 287 Ill. App. 3d 330, 334, 678 N.E.2d 369 (1997).  We review the trial court's grant of such a motion 
de novo
.  
McNamee v. State
, 173 Ill. 2d 433, 438, 672 N.E.2d 1159 (1996).  

The legislative history of the Good Samaritan Act proves illuminating.  On June 21, 1965, our legislature passed an act designed to encourage physicians fearful of malpractice suits to stop and render aid to those injured in automobile accidents.  It provided:

"Any person licensed pursuant to this Act, or 

any person licensed to practice the treatment 

of human ailments in any other state or territory 

of the United States, except a person licensed to 

practice midwifery, who in good faith provides 

emergency care without fee at the scene of a motor 

vehicle accident or in case of nuclear attack shall 

not, as a result of his acts or omissions, except 

wilful or wanton misconduct on the part of such 

person, in providing such care, be liable for civil 

damages." Ill. Rev. Stat. 1965 ch. 91, par. 2(a).

The Act was amended in 1969 by making it applicable "to a victim of an accident" rather than only motor vehicle accidents.  Pub. Act 76-1205.  In 1973, the Act was amended by adding the phrase "and without prior notice of the illness or injury" and substituted the word "person" for "victim of an accident at the scene of the accident or in the case of nuclear attack." Pub. Act 78-385. The Act remained essentially unchanged from 1973 until 1998.          

At the time of the alleged malpractice, the Act provided:    

 "Any person licensed pursuant to this Act or any

person licensed to practice the treatment of human 

ailments in any other state or territory of the United 

States, ***who, in good faith, and without prior notice of

the illness or injury, provides emergency care without 

fee to a person, shall not, as a result of his acts or

omissions, except wilful or wanton misconduct on the 

part of the person, in providing the care, be liable for 

civil damages."  Ill. Rev. Stat. 1985, ch. 111, par.

4404.

We note that effective August 13, 1998, the Act was amended to 

provide as follows:

"Any person licensed under the Medical Practice

Act of 1987 or any person licensed to practice the 

treatment of human ailments in any other state or 

territory of the United States who, in good faith, 

provides emergency care without fee to a person, shall

not, as a result of his or her acts or omissions, except 

willful or wanton misconduct on the part of the person, 

in providing the care, be liable for civil damages." 745 

ILCS 49/25 (West 1998).

The 1998 amendment to the Act dropped the requirement that the treating physician had to act "without prior notice of the illness or injury."  Pub. Act 90-742, § 40 (eff. August 13, 1998).

Our legislature intends that the provisions of the Act be liberally construed.  745 ILCS 49/2 (West 1998).  The application of the pre-amended Act involves a three-part test: (1) the doctor must not have notice of the injury; (2) the doctor must provide emergency care; and (3) the doctor must not charge a fee.  
Villamil v. Benages
, 257 Ill. App. 3d 81, 84, 628 N.E.2d 568 (1993).  The language of the pre-amended Act is applicable as "statutes are presumed to apply prospectively only and will not be given retroactive effect absent clear language within the statute indicating that the legislature intended such effect."  
First of America Bank, Rockford, N.A. v. Netsch
, 166 Ill. 2d 165, 182 (1995).  

Blanchard asserts that there is a genuine issue of material fact as to whether Dr. Murray was "on call" when he delivered Kameron by cesarean section.  According to Blanchard, there are two  pieces of evidence that demonstrate Dr. Murray was on call.  First, Blanchard points to Dr. Penn's testimony that Dr. Murray "was on call for that particular night."  Second, Blanchard asserts that Dr. Penn testified that he obtained Dr. Murray's name from a list of on-call physicians at the nurse's station.  In response, Dr. Murray asserts that the fact he was included on a list of all obstetricians on staff at West Suburban so the hospital would be able to reach someone in case of an emergency did not make him on call.

We first address whether Dr. Murray's on-call status is relevant in the context of the requirements of the Act.  Blanchard asserts that whether Dr. Murray was on call is an issue of material fact based upon the legislative purpose of the Act, which provides: 

"The General Assembly has established numerous 

protections for the generous and compassionate acts of

its citizens who volunteer their time and talents to help

others.  These protections or good samaritan provisions

have been codified in many Acts of the Illinois Compiled 

Statutes.  This Act recodifies existing good samaritan 

provisions.  Further, without limitation the provisions

of this Act shall be liberally construed to encourage 

persons to volunteer their time and talents."  745 ILCS

49/2 (West 1998).

This language was added as part of the amendment of the Act in 1998.  As explained in section 2, "This Act recodifies existing Good Samaritan provisions." 745 ILCS 49/2 (West 1998).  Consequently, Blanchard argues that there is no reason to believe that the legislative purpose of protecting "volunteers" as reflected in section 2 is any different then it was when the Act was first passed in 1965.  The legislative history of the amended Act reveals that its intent is to "encourage good samaritans to do the right thing on the streets of Illinois, *** without fear of repercussions in a court of law."  89
th
 Ill. Gen. Assem., House Proceedings, March 26, 1996 at 100 (statements of Representative Lang).  This legislative intent is in line with the intent of the Act in other jurisdictions as noted in 
Colby v. Schwartz
, 78 Cal. App. 3d 885, 890, 144 Cal. Rptr. 624, 627 (1978):

"At common law, a physician could with legal

impunity refuse to aid a stranger in need of immediate

medical care.  But a physician who stopped and gave aid

created a doctor-patient relationship and thereby assumed

the duty of reasonable care toward the patient. Further,

under the exigent circumstances of this type of care, 

the quality and quantity of a physicians's treatment is 

[
sic
] necessarily reduced.  As a result, the chances of 

medical failure are increased.  Thus, notwithstanding

a best efforts attempt, a physician who rendered 

emergency medical care became the natural target of

malpractice actions."  
   

The duty of physicians to respond to the requests of fellow doctors and other hospital staff was extensively discussed in a recent article in 
The Journal of Legal Medicine
:

"Because of the requirements of hospital 

accrediting organizations, adequate protections to 

ensure a physician's response to patient emergencies 

in hospitals are written into hospital bylaws and 

the rules and regulations of the medical staff. 

Physicians must agree to abide by these documents 

as a condition of medical staff appointment. In 

addition, interphysician relationships and hospital-

physician relationships guarantee that physicians 

in hospitals, and even physicians who are at home, 

will respond to colleagues' calls for assistance. 

Thus, the hospital patient who suffers an emergency 

is not among a class of persons who might not 

otherwise receive care.

For these same reasons, physicians who care for 

patients in hospitals are not volunteers in the sense 

of the person who by chance comes upon the scene of

an accident." S. Reuter,
 Physicians as Good Samaritans, 

the Genre of Legal Medicine
, 
20 J. Legal Med
. 157 at 

189 (1999).

The article notes that in 6 states Good Samaritan statutes expressly allow immunity in hospitals, 12 expressly disallow such immunity, and 2 states have held emergency care in hospitals are not granted such immunity.  20 J. Legal Med. at 193 n.1.        

Blanchard strenuously argues that the drafters of the Act intended it to be used to encourage doctors to assist injured parties in situations such as a roadside accident or injuries along a public street.  

As already mentioned, the legislative history would lend support to this argument. It is interesting to note that in a column in 1967, a commentator noted at the time of the initial enactment of the Good Samaritan Act: "it is curious that its enactment was thought to be necessary in Illinois where there is not a single reported case of a doctor being sued for malpractice after stopping to render aid in an emergency situation. The object of the statute must have been to remove what was apparently an unfounded fear."  M.  Hoyt, The Good Samaritan Statute, 44 Chi.-Kent L. Rev. 166-67 (1967).  Although 35 years have passed since this insightful observation was made, there is still no reported case in Illinois of a doctor being sued for malpractice after stopping to render aid in an emergency situation arising outside of a hospital setting. 

However, there are four cases in Illinois addressing the Act within the context of an emergency situation arising within a hospital.  While this application may not be consistent with what the legislature intended, the plain language of the Act makes it applicable to emergency situations in hospital settings.  The primary rule of statutory construction requires courts to give effect to the intent of the legislature.  
Boaden v. Department of Law Enforcement
, 171 Ill. 2d 230, 237, 664 N.E.2d 61 (1996).  The best indication of the legislature's intent is the language of the subject statute, and courts must give clear and unambiguous terms in  a statute their plain and ordinary meaning.  
Brooks v. City of Peoria
, 305 Ill. App. 3d 806, 811, 712 N.E.2d 387 (1999).  A court has no right to say that the legislature did not mean what the plain language of the statute provides.  
In re D.L.
, 191 Ill. 2d 1, 19 (2000).                 

This court has addressed the Act four times.  A review of the holdings in those cases reveals that we have indeed liberally construed the plain language of the Act.  In 
Johnson v. Matviuw
, 176 Ill. App. 3d 907, 531 N.E.2d 970 (1988), the defendant physician had staff privileges at the hospital.  The plaintiff was admitted to the hospital 37 weeks pregnant, complaining of numbness and pain in her leg, hyperventilation and chest pain. The defendant, who was attending to one of his own patients in the hospital, was summoned to assist when plaintiff experienced respiratory and cardiac arrest.  The defendant inserted an endotracheal tube and began resuscitation. A respiratory team arrived and provided more assistance. Subsequently, the plaintiff's doctor arrived to take over rendering assistance, but the plaintiff could not be resuscitated. The plaintiff and her child died. The administrator of the plaintiff's estate filed suit against the defendant and others. The defendant filed a motion for summary judgment on the ground that he was immune pursuant to the Good Samaritan Act.  The court granted the defendant's motion for summary judgment and on appeal, the plaintiff contended,
 inter alia
, that as a staff member of the hospital, the defendant had a preexisting duty to assist in the emergency, and, therefore,  the Good Samaritan Act did not apply. In 
dicta
, the appellate court noted the following: "California has disallowed statutory immunity where there is a preexisting duty to render emergency aid, as in the case of members of a hospital's emergency call panel.  
Colby v. Schwartz
 (1978), 78 Cal. App. 3d 885, 144 Cal. Rptr. 624."   
Johnson
, 176 Ill. App. 3d at 918.  The court in 
Johnson
 ultimately held that the defendant's actions fell squarely within the Act and affirmed summary judgment in his favor.  
Johnson
, 176 Ill. App. 3d at 917-18.     

In 
Roberts v. Myers
, 210 Ill. App. 3d 408, 569 N.E.2d 135 (1991), the defendant had staff privileges at the hospital and was attending to one of his own obstetrical patients when he was called to assist with the plaintiff, who was experiencing labor pains.  The plaintiff arrived at the hospital at 5:30 a.m. and had been seen by her personal obstetrician. At 5:12 p.m., the defendant was informed that there was a deceleration in fetal heart tones for the plaintiff's baby. The defendant conducted a fetal exam 18 minutes later and then went to the doctors' lounge.  Approximately 10 minutes later, a nurse was unable to detect any fetal heart tones and the defendant was summoned to conduct an emergency delivery.  Plaintiffs' expert testified that there was no indication of fetal distress until the plaintiff was taken to the delivery room.  In his deposition, the defendant testified that he was not on call and that his progress notes were entitled "Covering Attending Delivery Note" simply because he was the one delivering the baby.  
Roberts
, 210 Ill. App. 3d at 411-12.  This court affirmed summary judgment in favor of the defendant, holding there was no question of fact precluding the trial judge's decision that the defendant did not have notice of the illness or injury.  
Roberts
, 210 Ill. App. 3d at 417.

In 
Villamil v. Benages
, 257 Ill. App. 3d 81, 628 N.E.2d 568 (1993), the defendant doctor was in the hospital attending to his own patient when he was called into the operating room to deliver plaintiff's baby.  The baby was delivered 10 to 15 minutes after defendant's arrival.  The court raised the issue of whether the defendant was on call in the context of whether the defendant provided emergency care to the plaintiff and noted that it was undisputed that the defendant was not on call, but did in fact provide emergency care to the plaintiff.  
Villamil
, 257 Ill. App. 3d at 92.  The court subsequently affirmed summary judgment in favor of the defendant based upon the Act.

We note that this court recently addressed the applicability of the Act in 
Rivera v. Arana
, 322 Ill. App. 3d 641 (2001).  In 
Rivera
, the minor plaintiff was treated by defendant for a foot infection when he was brought to a medical clinic.  It was undisputed that the defendant was a physician on staff at the clinic working with three other doctors.  Plaintiff conceded that the defendant had no notice of the injury or illness he treated.   
The court in 
Rivera
 did not raise the issue of whether the defendant was on call within the context of the provision of emergency care or otherwise.  
Rivera
, 322 Ill. App. 3d at 647.

Rather, the court examined the elements of the Act to decide whether the defendant was immune from liability and affirmed the trial court's grant of summary judgment in favor of the defendant. 

This court's decisions in 
Johnson
, 
Roberts
, 
Villamil
, and 
Rivera
 all addressed the Act in the context of motions for summary judgment. On appeal, plaintiff argues that the holdings in 
Johnson
, 
Roberts
 and 
Villamil
 turned, at least in part, on the fact that the doctors in those cases were not on call, unlike defendant.

Plaintiff argues that the issue of whether Dr. Murray was on call goes to whether he owed a duty to respond.  If he did not have a duty to respond, then the " 'need to encourage physicians to render emergency medical care when they otherwise might not' prevails over the policy of vindicating the rights of a malpractice victim."  
McKenna v. Cedars of Lebanon Hospital
, 93 Cal. App. 3d 282, 288, 155 Cal. Rptr. 631, 635 (1987), quoting 
Colby
, 78 Cal. App. 3d at 892-93, 144 Cal. Rptr. at 629.  
While this court in 
Johnson
 cited 
Colby
, we did so in the context of pointing out how other jurisdictions have dealt with the issue of when good samaritan statutes apply to given situations.

In applying the plain language of Illinois' Good Samaritan Act to the facts of this case, it becomes clear that it does matter whether Dr. Murray was on call when he responded to Dr. Penn's request for assistance.  When Dr. Murray received the phone call at home, was told of the nature of plaintiff's illness, and then elected to leave home, drive to the hospital and perform the surgery at issue, such actions constituted "prior notice of the illness" within the meaning of the statute.  

A review of the record establishes that no genuine issue as to any material fact exists as to whether Dr. Murray had prior notice. It is uncontested that Blanchard was never a patient at West Suburban prior to April 29, 1991. There is also no dispute that Dr. Murray had not seen Blanchard before the date of her delivery.  Dr. Murray was called  at approximately 3:10 a.m. and informed of the baby's heart decelerations.  Dr. Murray went to the hospital for the purpose of treating the plaintiffs.  Dr. Murray arrived at the hospital at 4 a.m. and approximately 26 minutes later, the cesarean section operation began.  

These facts are extremely different than those in the cases previously cited.  In 
Johnson
 and 
Villamil
, the doctors rendering aid were in the hospital treating other patients when they were asked to assist patients who were undergoing cardiac arrest and immediate childbirth, respectively.  The facts in 
Roberts
 are much closer, where the doctor first examined a patient 18 minutes after first being told of a deceleration in fetal heart tones.  The doctor began an emergency delivery 10 minutes later when a nurse was unable to detect any fetal heart tones.  But even there, the plaintiff's expert testified that there was no indication of fetal distress until the plaintiff was taken to the delivery room.  In the instant case, 76 minutes passed from the time Dr. Penn contacted Dr. Murray to the time Dr. Murray began the cesarean section.  While a lack of prior notice is no longer a prerequisite  for application of the protections of the Act, it was a necessary factor prior to August 13, 1998.

While our holding that Dr. Murray had prior notice of the injury or illness for purposes of the Good Samaritan Act requires us to reverse the trial court's grant of summary judgment for Dr. Murray, we choose to address the remaining issues as there is so little case law addressing the Act. 

Blanchard contends that the trial court erred in granting summary judgment under the Act where her medical situation was not an emergency. Blanchard argues that Dr. Murray's deposition testimony in which he described the difference between an emergent and urgent situation demonstrates that it was not an emergency situation. Blanchard finds further support for her position by referencing Dr. Murray's testimony that, sometimes, a patient's physical condition is characterized as an emergency in order to persuade a physician to assist.

In examining Dr. Murray's testimony, we emphasize the following statements he made regarding emergent care: 

"There are different degrees of emergency.  One

is - the real emergency is imminent death, that all of 

a sudden the heart tones go to 60 or 40 or 0, ad [
sic
] 

you got four minutes, you got to cut.  You can't wait

for anything.

* * *

The next one is its going to have to be done,

and you can't wait till the regular morning schedule to

do it."  

Dr. Murray indicated that the second degree of emergency he 

described could be characterized as either "emergent or "urgent" 

because different people describe the situation in different ways.

Dr. Murray specifically testified that in Blanchard's case, the latter type of emergency he described fit her situation.

As Illinois has few cases addressing the Act, we look to other jurisdictions to guide us in defining an emergency.  In 
Breazeal v. Henry Mayo Newhall Memorial Hospital
, 234 Cal. App. 3d 1329, 1338, 286 Cal. Rptr. 207 (1991), the court reviewed what constitutes an emergency within the context of the Act: "An emergency within the meaning of the Good Samaritan statute exists when there is an urgent medical circumstance of so pressing a character that some kind of action must be taken."  
Breazeal
, 234 Cal. App. 3d at 1338, 286 Cal. Rptr. at 213 (1991).

Further support for Dr. Murray's definition of emergent care is found in 
Rivera
, where this court held:    

"[A] flexible broad definition, given the purposes 

of the Good Samaritan Act and the need for medical 

providers to intervene and take care of individuals 

under a variety of situations without the threat of 

liability, is more logical. Rather than a bright-line 

rule, we believe that whether an emergency situation 

exists is to be resolved based on the unforeseen, 

unexpected combination of circumstances presented 

which require the need for immediate action, assistance, 

or relief." 
Rivera
, 322 Ill. App. 3d at 651.  

 

While we agree that a bright-line rule is inappropriate, we hold that in determining whether a patient's condition constitutes an emergency, the trier of fact must consider the gravity, the certainty, and the immediacy of the consequences to be expected if no action is taken.  
Breazeal
, 234 cal. App. 3d at 1338, 286 Cal. Rptr. at 213.

Dr. Murray also testified that not only was Blanchard's baby in fetal distress due to heart decelerations, but that the umbilical cord was wrapped around the baby's neck.  Based upon this record, we conclude that the trial court correctly found that the situation Dr. Murray was presented with was an emergency.

Regarding the third requirement under the Act, Blanchard contends that the Act is inapplicable where the reason that Dr. Murray did not charge a fee for his services was because he was supporting the residency program at West Suburban, rather than volunteering his time and talent with charitable intent toward Blanchard.  Blanchard again cites section 2 of the Act, which provides that the purpose of the Act is to establish protections for the acts of citizens who volunteer their time and talents for the benefit of others. Dr. Murray responds that whom he intended to benefit by not charging for the emergency care is irrelevant.

A review of the Act reveals that there is no requirement that the intent behind not charging a fee for medical services must be solely to benefit the person receiving those services.  In 
Johnson
, this court held that the fact that the hospital billed plaintiff for services to his wife and unborn child had no bearing on Dr. Matviuw's alleged liability as the bill did not indicate a charge for the doctor's professional services.  
Johnson
, 176 Ill. App. 3d at 917.  In 
Villamil
, the defendant doctor's office sent a letter to plaintiff asking for her public aid number following the delivery of her premature infant. This court found that the services were rendered gratuitously. "[T]he statute mentions nothing of intent, and therefore, even if the public aid letter could be construed as an intent to bill in the future, the fact that no bill was ever sent or payment provided must be controlling on this issue."  
Villamil
, 257 Ill. App. 3d at 92.  
Rivera
 followed 
Villamil
 and held that the fact that the defendant doctor was never paid was controlling as to whether the third factor required for application of the Act was met.  
Rivera
, 322 Ill. App. 3d at 648. 

Based on the aforementioned reasons, the trial court's entry of summary judgment for Dr. Murray is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

Reversed and remanded. 

GREIMAN and REID, JJ., concur.

FOOTNOTES
1:
Dr. Mark Penn and West Suburban Hospital are defendants in

the underlying case, but are not parties to this appeal.