No. 2--03--0400

_________________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________________________

MONISOLA SHITTU SOMOYE, ) Appeal from the Circuit Court

Indiv. and as Next Friend of Dolapo ) of Du Page County.

Somoye, a Minor, and KEN SOMOYE, )

)

)

Plaintiffs-Appellants, )

)

v. ) No. 99--L--273

)

JAMES A. KLEIN, HINSDALE FAMILY )

MEDICINE CENTER, HINSDALE )

HOSPITAL, and JONI S. HALES, )

)

Defendants ) Honorable

) Hollis L. Webster,

(James C. Falcone, Defendant-Appellee). ) Judge, Presiding.

_________________________________________________________________________________

JUSTICE BYRNE delivered the opinion of the court:

Plaintiffs, Monisola Shittu Somoye and Ken Somoye, filed a complaint alleging the negligent delivery of their newborn son, Dolapo Somoye, on November 30, 1997.  The trial court granted defendant, James C. Falcone, M.D., summary judgment on the theory that his conduct was immunized under section 25 of the Good Samaritan Act (Act) (745 ILCS 49/25 (West 1996)).  Plaintiffs appeal, arguing that summary judgment is precluded by two factual questions: (1) whether defendant had prior notice of the illness or injury and (2) whether defendant was providing emergency care.  The remaining defendants were dismissed from the action and are not parties to this appeal.  We reject plaintiffs' argument and affirm the judgment accordingly.

FACTS

We have identified the following undisputed facts.  Monisola received prenatal care at Hinsdale Family Medicine Center (the center).  Dr. Klein, a family practice resident, was assigned to her case.  The center's policy provided that a resident such as Dr. Klein would follow the patient's prenatal care and perform certain deliveries under the supervision of an attending family practice physician.  If a cesarean section delivery was necessary, an obstetrical consultant must assist.

The center had agreements with obstetricians with privileges at Hinsdale Hospital (the hospital) to perform consulting services including the performance of cesarean section deliveries.  In November 1997, four obstetricians, who are not involved in this case, were contracted to perform consulting services for the center.  An "on call" sheet was posted at the nurses' station identifying which of these consultants was "on call."

At approximately 8 p.m. on November 29, 1997, Monisola was at home when she noticed that the baby had stopped moving in her womb.  She drank some juice because she had been advised to drink something sweet if she thought the baby was unusually inactive.  There was no reaction to the juice, so the parents went to the hospital emergency room a short time later.  Monisola was transferred to the labor and delivery unit, where Dr. Kuhlman, the "on call" family practice physician from the center, placed her on a fetal monitor.  At 10 p.m., Dr. Kuhlman contacted Dr. Hales, the center's attending family practice physician, at home and told her that Monisola presented a lack of fetal movement and poor heart rate variability.  Based on this information, Dr. Hales could not determine whether the baby was in distress.

Defendant, an obstetrician, arrived at the labor and delivery unit between 10 and 10:15 p.m. to deliver the baby of one of his patients.  He did not anticipate treating Monisola and he was not aware of her medical condition.  At approximately 10:30 p.m., Dr. Kuhlman encountered 
defendant
 in a hospital hallway and asked 
defendant
 to recommend a course of action for his patient based on a brief description of her condition.  Dr. Kuhlman explained that he could not reach the "on call" obstetrical consultant, Dr. Kim.  Dr. Kuhlman told 
defendant
 that the patient came to the hospital because she noticed decreased fetal movement.  A fetal monitor revealed that the fetal heart rate was stable but the variability of the heart rate was flat.  Dr. Kuhlman also mentioned that the patient's due date was in question because she appeared unusually large for the projected gestational period.  Defendant recommended to Dr. Kuhlman that he hydrate the patient and determine the status of the fetus by using an oxytocin challenge test.  Defendant ended the conversation and returned to his own patient.

Jean Kingery, a nurse in the labor and delivery unit, recalled that 
defendant
 recommended the oxytocin challenge test to Dr. Kuhlman.  Defendant did not prepare a written order, but Kingery wrote "OCT verbal order, [defendant]" on Monisola's chart because Dr. Kuhlman needed to consult an obstetrician before the test could begin.  At her deposition, Kingery noted that it was more accurate to say that Dr. Kuhlman ordered the test after consulting 
defendant
.

At approximately 12:30 a.m., Dr. Kuhlman again encountered 
defendant
 in the hallway and asked for help in evaluating Monisola's condition.  Dr. Kuhlman told 
defendant
 that Monisola's attending physician, who was at home, recommended that the baby be delivered that night.  Defendant examined Monisola and determined that the baby could not be delivered vaginally.  Defendant explained to Monisola that a cesarean section delivery was necessary.  Defendant opined during his deposition that the cesarean section delivery was elective and not an emergency procedure.  He believed that waiting until the following morning to perform the delivery would not have posed a risk to the mother or fetus as long as the fetal heart-rate strip did not change.

Nurse Kingery prepared Monisola for the procedure while 
defendant
 returned to his own patient to deliver her child by cesarean section.  Defendant told Dr. Kuhlman that he would deliver Monisola's baby if no other obstetrician was available.  Defendant delivered his patient's baby at 1:37 a.m.  After that cesarean delivery was completed, Monisola was taken to the surgical suite where 
defendant
 delivered her baby by cesarean section at 3:12 a.m.  The baby now suffers from cerebral palsy, seizure disorder, and developmental delay.  Defendant did not charge a fee or receive any compensation for his services.

Plaintiffs filed a complaint alleging the negligent delivery and birth of the baby.  According to the complaint, 
defendant
s were negligent for delaying the delivery for four hours from 10:30 p.m. on November 29, 1997, to 2:30 a.m. the following morning.  The center and the hospital settled plaintiffs' claims for a lump sum of $2.1 million and periodic future payments that have a present cash value of $1.9 million.  Defendant moved for summary judgment, invoking section 25 of the Act.  The trial court granted 
defendant
 summary judgment, and plaintiffs timely appeal.

ANALYSIS

In every appeal from the entry of summary judgment, we conduct a 
de
 
novo
 review of the evidence in the record.  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 113 (1995).  Summary judgment is appropriate where the pleadings, affidavits, depositions, and admissions on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.  735 ILCS 5/2--1005(c) (West 2002); 
Bier v. Leanna Lakeside Property Ass'n
, 305 Ill. App. 3d 45, 50 (1999). "Summary judgment is a drastic means of resolving litigation and should be allowed only when the right of the moving party is clear and free from doubt."  
Bier
, 305 Ill. App. 3d at 50.  "Therefore, where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact."  
Espinoza
, 165 Ill. 2d at 114.

On appeal, plaintiffs argue that summary judgment for 
defendant
 was inappropriate because factual questions exist as to whether 
defendant
's conduct was immunized under section 25 of the Act.  At the time of the alleged malpractice, the Act provided as follows:

"Any person licensed under the Medical Practice Act of 1987 or any person licensed to practice the treatment of human ailments in any other state or territory of the United States, except a person licensed to practice midwifery, who, in good faith and without prior notice of the illness or injury, provides emergency care without fee to a person, shall not, as a result of their acts or omissions, except wilful or wanton misconduct on the part of the person, in providing the care, be liable for civil damages."  745 ILCS 49/25 (West 1996).

In 1998, the legislature amended the Act, dropping the requirement that the treating physician act "without prior notice of the illness or injury."  Pub. Act 90--742, §40, eff. August 13, 1998.  However, the preamended version of the Act applies to this case because a statute is presumed to apply prospectively only and will not be given retroactive effect absent clear language within the statute indicating that the legislature intended such effect.  See 
Blanchard v. Murray
, 331 Ill. App. 3d 961, 967-68 (2002).

Our legislature intends that the provisions of the Act be liberally construed to encourage people to volunteer their time and talents.  745 ILCS 49/2 (West 1996).  The preamended version of the Act immunizes a doctor from liability if a three-part test is passed: (1) the doctor must not have notice of the injury; (2) the doctor must provide emergency care; and (3) the doctor must not charge a fee.  
Blanchard
, 331 
Ill. App. 3d
 at 967.  In this case, it is undisputed that 
defendant
 did not charge a fee for his services.  Plaintiffs contend that questions of fact exist regarding the other two factors.   We initially address 
plaintiff
s' argument that 
defendant
 had notice of Monisola's injury or condition at the time he treated her.  Plaintiffs argue that this case is similar to 
Blanchard
, in which a patient sued a doctor for the negligent delivery of her baby.  The appellate court concluded that the doctor was not entitled to summary judgment because he had notice of the patient's condition for the purposes of section 25 of the Act.  In 
Blanchard
, the patient was never treated at the hospital before the delivery, and the doctor had never seen her before.  However, the doctor was "on call" at home at approximately 3:10 a.m. when he was informed of the baby's heart decelerations and summoned to the hospital for the sole purpose of delivering the baby.  The allegedly negligent cesarean section delivery began 26 minutes after the doctor arrived at the hospital.  
Blanchard
, 331 
Ill. App. 3d
 at 972.  The appellate court held that "when [the doctor] received the phone call at home, was told of 
the nature of plaintiff
's illness, and then elected to leave home, drive to the hospital and perform the surgery at issue, such actions constituted 'prior notice of the illness' within the meaning of the statute."  
Blanchard
, 331 
Ill. App. 3d
 at 972.

We distinguish this case from 
Blanchard
 on the facts, concluding that 
defendant
 did not have notice of Monisola's condition.  Here, 
defendant
 was not the "on call" obstetrician on the night of the delivery.  Defendant was present at the hospital only to deliver the baby of one of his own patients when Dr. Kuhlman approached him in a hallway for a brief consultation at 10:30 p.m.  At that time, 
defendant
 did not examine Monisola or even learn her name.  He answered Dr. Kuhlman's questions in only hypothetical terms and suggested a particular test to better ascertain her condition.  Defendant delivered the baby only after Dr. Kuhlman told him that the attending physician recommended that a cesarean delivery be performed that night.

We agree with 
defendant
 that this case is more like 
Roberts v. Myers
, 210 
Ill. App. 3d
 408 (1991), in which the defendant doctor successfully invoked section 25 of the Act in defense to a claim of negligent performance of a cesarean section delivery.  In 
Roberts
, the plaintiff arrived at the hospital at 5:30 a.m. and had been seen by her personal obstetrician.  At 5:12 p.m., the defendant, who had staff privileges at the hospital, was attending to one of his own obstetrical patients when he was called to assist with the plaintiff, who was experiencing labor pains.  The defendant was informed that there was a deceleration in fetal heart tones for the plaintiff's baby.  The defendant conducted a fetal exam 18 minutes later and then went to the doctors' lounge.  Approximately 10 minutes later, a nurse was unable to detect any fetal heart tones and the defendant was summoned to perform an emergency delivery.  The plaintiffs' own expert admitted that there was no indication of fetal distress until the plaintiff was taken to the delivery room.  The defendant testified that he was not "on call" and that his progress notes were entitled "Covering Attending Delivery Note" simply because he was the doctor delivering the baby.  
Roberts
, 210 Ill. App. 3d at 411-12.

The appellate court affirmed summary judgment for the defendant, holding that there was no question that the defendant did not have notice of the illness or injury.  
Roberts
, 210 Ill. App. 3d at 417.  In reaching its conclusion, the court emphasized that, although the 
defendant
 had several contacts with the plaintiff before delivering the baby, the 
defendant
 was not covering for the plaintiff's personal obstetrician.  
Roberts
, 210 
Ill. App. 3d
 at 415.  The court further noted that the defendant learned of the baby's heart decelerations but lacked additional information to conclude that the baby was in distress.  
Roberts
, 210 
Ill. App. 3d
 at 416.

Like the doctor in 
Roberts
, 
defendant
 was not "on call" or covering for Monisola's obstetrician when Dr. Kuhlman sought his advice.  At approximately 10:30 p.m., Dr. Kuhlman told defendant that the baby's gestational age was uncertain and that the baby exhibited "non-reassuring" heart tones and a lack of fetal movement.  Plaintiffs insist that each condition "could be a complication" but they fail to cite evidence indicating that the information 
defendant
 knew at that time would have put him on notice that the baby was in distress.  In fact, the record shows that Dr. Kuhlman asked 
defendant
 for advice because he and Dr. Hales were uncertain whether the baby was in distress.  Defendant recommended the oxytocin challenge test as a diagnostic tool, and it is unclear when 
defendant
 learned the test results or even if they were conclusive.  When Dr. Kuhlman sought out 
defendant
 again at 12:30 a.m., defendant offered to deliver the baby if no other obstetrician was available to do so.  No one asked 
defendant
 to take over Monisola's case until she was prepared for the cesarean section delivery after 2 a.m.  Under these facts, we conclude that 
defendant
 did not have  notice of the injury for purposes of section 25 of the Act.

We next address plaintiffs' contention that section 25 does not immunize 
defendant
 from liability because he did not "provide emergency care" under the Act.  
Blanchard
, 331 
Ill. App. 3d
 at 967.  The fundamental rule of statutory interpretation is to give effect to the intention of the legislature.  A court first looks to the words of the statute, which is the best indication of the legislative intent.  When the statutory language is clear, it must be given effect without resort to other tools of interpretation.  In interpreting a statute, it is never proper for a court to depart from plain language by reading into the statute exceptions, limitations, or conditions which conflict with the clearly expressed legislative intent.  
County of Knox ex rel. Masterson v. The Highlands, L.L.C.
, 188 Ill. 2d 546, 556 (1999).

The Appellate Court, First District, has recently commented on the definition of "emergency" as that term is used in section 25 of the Act:

"[T]here are a variety of situations which may qualify as emergency care under the particular facts of a case, yet may not fall within any specific definition of emergency and may not be identified in medical literature as an emergency.  Accordingly, a flexible broad definition, given the purposes of the Good Samaritan Act and the need for medical providers to intervene and take care of individuals under a variety of situations without the threat of liability, is more logical.  Rather than a bright-line rule, we believe that whether an emergency situation exists is to be resolved based on the unforeseen, unexpected combination of circumstances presented which require the need for immediate action, assistance, or relief."  
Rivera v. Arana
, 322 Ill. App. 3d 641, 651 (2001).

For the purpose of the underlying negligence action, plaintiffs argue that defendant was negligent for delaying the emergency cesarean section delivery for four hours.  In response to the underlying claim, defendant argues that he acted reasonably because no emergency existed.  However, each side adopts the opposite legal position when addressing section 25 of the Act because the existence of an emergency would immunize defendant rather than create liability.  Each side contends that the other concedes the point:  plaintiffs cite defendant's testimony that no emergency existed, and defendant cites plaintiffs' complaint that alleges the existence of an emergency.

The record reveals that there is likely a factual question as to whether an emergency situation existed in this case, and ordinarily such a factual question would preclude the entry of summary judgment.  However, we conclude that we may affirm the entry of summary judgment for defendant regardless of how the factual question is resolved.  See 
Roketa v. Hoyer
, 327 Ill. App. 3d 374, 377 (2002) (the appellate court may affirm the grant of a summary judgment on any basis supported by the record even though it differs from the reason relied on by the trial court).

If no emergency situation existed, plaintiffs' underlying negligence claim fails regardless of the effect of section 25 of the Act because the claim alleges a negligent failure to act, 
i.e.
, to deliver the baby promptly.  It is undisputed that defendant was not an employee or agent of the hospital and that he had only "privileges" to practice there.  Therefore, no physician-patient relationship existed and defendant owed no duty to plaintiffs before he delivered the baby.  See 
Blanchard
, 331 
Ill. App. 3d
 at 968, quoting 
Colby v. Schwartz
, 78 Cal. App. 3d 885, 890 (1978) (" 'At common law, a physician could with legal impunity refuse to aid a stranger in need of immediate medical care.  But a physician who stopped and gave aid created a doctor-patient relationship and thereby assumed the duty of reasonable care toward the patient' ").  If no emergency existed, defendant owed no duty to act, and the absence of a duty defeats the negligence claim.  Conversely, if an emergency existed, the underlying negligence claim survives but section 25 immunizes defendant's conduct because he had no notice of the injury and he did not charge a fee for his services.

For the preceding reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

KAPALA and GILLERAN JOHNSON, JJ., concur.